(No. 96288.

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. ANTHONY B. MERTZ, Appellant.

*Opinion filed November 17, 2005.—Rehearing denied January 23, 2006.*

6

Charles M. Schiedel, Deputy Defender, of Springfield, and Steven Clark, Assistant Defender, of Chicago, both of the Office of the State Appellate Defender, for appellant.

Lisa Madigan, Attorney General, of Springfield, and C. Steve Ferguson, State's Attorney, of Charleston (Gary Feinerman, Solicitor General, and Linda D. Woloshin and Jay Paul Hoffmann, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE KARMEIER delivered the opinion of the court:

Following a jury trial in the circuit court of Coles County, defendant, Anthony B. Mertz, was convicted of first degree murder (720 ILCS 5/9—1(a) (West 2000)), home invasion (720 ILCS 5/12—11(a) (West 2000)), and aggravated criminal sexual assault (720 ILCS 5/12—14(a) (West 2000)). At a subsequent death penalty hearing, the same jury found defendant eligible for the death penalty, and thereafter concluded there were no mitigating factors sufficient to preclude the imposition of a death sentence. Accordingly, the circuit court sentenced defendant to death on the first degree murder conviction. The court also sentenced defendant to 60 years' imprisonment on the home invasion conviction. No sentence was imposed for aggravated criminal sexual assault. Because defendant was sentenced to death, his appeal was brought directly to this court. Ill. Const. 1970, art. VI, § 4(b); 134 Ill. 2d R. 603.

At the outset, we note that defendant's guilt is not in

question. He does not contest the sufficiency of the evidence in that regard. He raises no issue pertaining to the guilt/innocence phase of his trial. All issues defendant advances in this appeal relate to the propriety of his death sentence.

Specifically, defendant contends (1) evidence of his "political statements, books, guns, tattoos, photos of girlfriends, internet articles, and sexually explicit sites" was either irrelevant or unreliable aggravation and was admitted in violation of the United States and Illinois constitutions; (2) aggravation testimony by a criminal "profiler" was improper as it was irrelevant and unreliable; (3) the use of "unreliable jailhouse informants and unreliable, uncharged crimes" in aggravation denied defendant a fair sentencing hearing; (4) "the death penalty is 'fundamentally unjust' under section 9—1(i) of the Criminal Code of 1961 (720 ILCS 5/9—1(i) (West 2000)), when recently adopted legislative reforms in death penalty proceedings were unavailable; the aggravation relied on uncharged, unproven crimes; and the death sentence is disproportionate to lesser sentences for similar crimes"; (5) the imposition of a death sentence is excessive "in light of the influence of prescription drugs on defendant, defendant's inherited alcoholism, military service, employment, attending college, minor criminal conviction, church attendance, low risk of future dangerousness, and dysfunctional family"; (6) Illinois' death penalty statute is unconstitutional under *Apprendi v. New Jersey*, because the State is not required to prove beyond a reasonable doubt that there are no mitigating factors sufficient to preclude a death sentence; and (7) Illinois' death penalty is arbitrarily applied, "based on race, geography, procedural evolution, discretion, and mistakes of fact, in violation of the federal and Illinois constitutions' due process and sentencing rights."

We have thoroughly reviewed the record in this case.

As the basis for our decision is dependent to a significant extent upon specific facts adduced at trial, the relationship of proper evidence to challenged evidence, and the weight of evidence in aggravation and mitigation, we set forth, hereafter, a comprehensive summary of pertinent evidence from defendant's lengthy trial.

## BACKGROUND

On June 12, 2001, Shannon McNamara was found murdered in her apartment near the campus of Eastern Illinois University in Charleston, Illinois. The primary cause of McNamara's death was subsequently determined to have been "asphyxia due to choking, due to a wash rag virtually stuffed into her mouth." The washcloth had been so tightly packed into McNamara's mouth that it had to be removed "forcibly" during the autopsy. The pathologist who performed the autopsy on McNamara described contributing causes of her death as follows: "manual strangulation, smothering by placing of the hand or hands over the mouth; hemoperitoneum, that is the presence of a large quantity of blood in the peritoneum cavity due to lacerations of the liver; and *** stab cutting wound to the abdomen."

The pathologist noted one incise wound to the left side of the victim's chin, five incise wounds to her neck, one long incise wound to her abdomen—running from the base of her sternum to the top of her pubis, exposing a portion of her bowel—one incise wound between the thumb and forefinger of her left hand, another to the base of her ear, an incise wound of the vagina, an incise wound extending from the sacral area of the victim's back to her anus, three parallel incise wounds across the breadth of the victim's back, and one incise wound running the length of her back.

In addition to incise wounds, the victim had multiple bruises and contusions over various parts of her body. Bruises were so numerous they were not assigned

numbers during the autopsy. McNamara had multiple contusions to her neck which, in the pathologist's opinion, might have been self-inflicted, the result of her attempts to extricate hands or other objects from around her neck. The pathologist noted bruising on the left side of the victim's neck and jaw, as well as multiple bruises and abrasions of her right elbow. Bruising was evident on the right and left sides of her mouth, on her lips, and just below her chin. The frenulum of her upper lip was torn, and bleeding was observed inside her mouth. Multiple bruises about the neck were indicative of manual or ligature strangulation. A large bruise was noted in the left hip region, and there were scattered bruises in the lower chest and upper abdominal area. Broad surface, blunt force impact had caused multiple lacerations of the liver, and significant internal bleeding. The pathologist testified that "a severe or large amount of force" is required to lacerate the liver, and such a blow would have caused the victim "a great deal" of pain. The victim had also suffered blows to the head that had resulted in "subarachnoid and subdural hemorrhage overlying the brain."

Crime scene investigation revealed that entry into the victim's apartment had been accomplished by cutting a window screen and opening an unlocked window. The victim was apparently attacked as she slept. The condition of the victim's bedroom and bathroom suggested that a struggle had begun in the victim's bedroom and continued in the bathroom, where the victim was eventually overcome. The dead or dying victim was then moved to the living room of her apartment where, in the opinion of crime scene investigator Richard Caudell, she was posed or "put on display." The victim was laid out on her back, naked, except for a bra and a T-shirt, which had been pulled up to expose her breasts. Her arms had been extended over her head, and she had been mutilated with

a butcher knife after she was beyond the point of resistance. That knife was later discovered in a dumpster behind the victim's apartment building. A torn latex glove was discovered near the victim's body. The handle of a box cutter, a pair of panties, and the defendant's bent credit card were found on the hallway floor adjacent to the bedrooms and bathroom.

Defendant was subsequently questioned and denied that he knew the victim or anyone living in her apartment. He admitted he knew two females lived in the apartment because he had seen them sunbathing. Defendant said he had never been in the victim's apartment. Defendant was arrested and charged with McNamara's murder and related offenses.

At the guilt phase of defendant's trial, the State adduced compelling evidence of defendant's guilt. As noted, his credit card was found on the floor of the victim's apartment in the area where the struggle had taken place. Moreover, scrapings from the victim's fingernails were analyzed and were found to be consistent with defendant's DNA profile. Testimony indicated that profile could be expected to occur in "one in 1.8 billion white unrelated individuals." Furthermore, shortly after the murder, investigating police officers observed marks on defendant's face, scratches on his neck, abrasions on his knees, and bruises on his arms and elsewhere on his body. In addition, a search of defendant's apartment revealed latex gloves secreted in a cloth bag. A box cutter was missing from defendant's place of employment.

Various witnesses testified that defendant frequently entered locked apartments—with and without authority—using credit cards to compromise the locks. One of defendant's friends testified that he had visited defendant a month before the murder and heard defendant mention the victim's name. The witness testified: "[H]e was on a website and he was looking at sports teams that I

think that she was involved with and there were bios on all of the girls and he mentioned her name." Another witness testified that she overheard defendant tell someone, during the initial stage of the police investigation, that there had been a "brutal knife murder" across the street from his apartment building. One of the police officers supervising the investigation testified that no one had been told there was a knife involved in the murder. Finally, two witnesses who were incarcerated with defendant at the Coles County Safety and Detention Center pending trial testified that defendant made admissions and other incriminating statements to them.

Defendant presented the testimony of another Coles County inmate who stated that the other inmate witnesses had fabricated their testimony to gain favorable treatment.

Defendant's former girlfriend, Tara Hofer, also testified on defendant's behalf. Hofer stated that she and defendant stayed at defendant's grandmother's house sometime prior to McNamara's murder. According to Hofer, she and defendant had sex that evening, and she noticed "rug burns" on defendant's knees when they got up the next morning. Hofer acknowledged she had been interviewed by police "on multiple occasions" following defendant's arrest. She could not recall whether she had ever told them about the "rug burns." Hofer also stated it was a common practice for students to use credit cards to open doors. Hofer further testified that defendant gave people permission to enter his apartment and access his computer equipment and belongings when he was not present.

Hofer stated on direct examination: "The police tried to get me to say that [defendant] had [a] problem with women and that he was violent." She said that was not true. On cross-examination, Hofer admitted defendant had come home drunk one evening, pulled her hair, and

threatened to kill her. The following colloquy ensued between the prosecutor and Hofer:

"Q. And did you tell Master Sergeant Bernardini that Mertz threatened to kill [you], break [your] neck, and threw you on the bed?

A. Yes.

Q. You told him that?

A. Yes.

Q. That was true, wasn't it?

A. Yes.

Q. And he placed his forearm across your throat and choked you?

A. Yes.

Q. And he doesn't have a problem with violence with women?

A. No."

Hofer denied that she had told police officers, three months after the murder, that she would love defendant even if he had murdered McNamara. She said the police tried to get her to say that.

Jack Smith, a licensed private investigator, also testified for the defense. In support of defendant's contention that he had cut his hand on a broken shot glass, Smith testified that he did in fact recover a broken shot glass from a trash can in defendant's apartment.

Defendant was advised of his right to testify, and declined the opportunity. Following closing arguments, the jury was instructed on the applicable law, and subsequently returned verdicts finding defendant guilty of first degree murder, home invasion and aggravated criminal sexual assault.

The jury subsequently found defendant eligible for the death penalty in that defendant was at least 18 years old and had committed the murder in the course of another felony, *i.e.*, aggravated criminal sexual assault or home invasion. See 720 ILCS 5/9—1(b)(6) (West 2000). The matter proceeded to the aggravation/mitigation phase of sentencing.

The State first called Cathy Boyer. Boyer testified that she resided in defendant's apartment building in September of 2000 and, on one occasion, awoke to find defendant sitting in a chair in her apartment, watching television. She had not invited defendant into her apartment, and he did not have permission to be there. He appeared to be drunk. Boyer stated that defendant had previously opened doors in the building with a credit card and a knife. She knew him to be violent when he drank.

Roger Hudson, a foreman at Eastern Illinois University's building services department, testified that defendant was a student worker under his supervision. Hudson said that defendant expressed an interest in female athletes. In the summer of 2000, Hudson was present when defendant said something to the basketball coach's daughter. When she walked on without replying, defendant commented that he "ought to slap the tan off her face." Hudson said he was aware that another building service worker had sold defendant a 9-millimeter pistol. Finally, Hudson testified that defendant had come to work one day in 2001 and commented that he had gone to Terre Haute, Indiana, "to the McVeigh execution[,] around through there." Defendant referred to the scene as a circus. After a few minutes, defendant stood up and said—apparently in reference to the McVeigh execution—"We the people, of the people, killing our own people." Defendant then walked out of the room.

Bobby Livingston, a building service worker with the university, testified that defendant had expressed sympathy for the "folks" in "Waco" and "Weaver Ridge." According to Livingston, other employees were afraid of defendant. After defendant was arrested for McNamara's murder, Lacie McDaniel, a student worker, told Livingston she had opened a closet door and had seen defendant "standing on the sink, doing something up high." Liv-

ingston and McDaniel went down to the janitor's closet. Livingston lifted a ceiling tile and observed the "butt of a gun."

John Blevins, a Charleston police officer, testified that Lacie McDaniel had advised him that on June 12, 2001, at approximately 5:30 p.m., she observed defendant standing on a sink in a janitor's closet with his hands above his head. When McDaniel told other building workers, they went to the closet and discovered a weapon. Blevins subsequently removed a .22-caliber revolver from ceiling tiles in the closet.

Blevins also testified that on April 12, 2001, at approximately 3:45 a.m., he was dispatched to 1128 Fourth Street in Charleston to investigate a report of two men fighting. Upon his arrival, Blevins heard a woman scream and observed defendant struggling with a man later identified as Brian Catt. The woman, Amy Joyner, pointed out defendant, and Blevins grabbed defendant, only then noticing that defendant had a knife at his side. Joyner later informed Blevins that she and Catt had been walking by defendant's building when defendant asked them if they wanted to come up to his apartment and "party." Joyner and Catt went up to defendant's apartment and had a few drinks. When defendant started flirting with Joyner, Catt and Joyner started to leave. Defendant then called Joyner a "narc" and pushed her down. Joyner got up and again tried to leave, and defendant again pushed her to the floor. Joyner told Blevins when she looked up she saw that defendant had "a dagger" in his hand. At that point, Catt and defendant started fighting. Catt's version of events was consistent with Joyner's. Defendant said he could not remember what had happened. Joyner suffered an abrasion on her forehead and abrasions on her knuckles. As a result of the incident, defendant was charged with aggravated assault, a charge that was still pending when defendant was tried on these charges.

Defendant had previously been convicted of battery in 2000. A certified copy of that conviction was introduced as evidence. The attendant probation order, which was signed in January of 2001, indicated that defendant was on probation at the time of the incident involving Joyner in April of 2001, and at the time of the McNamara murder in June of 2001. Paragraph eight of that order states that defendant "shall not possess a firearm or other dangerous weapon."

Michael Jordan, the jail inmate who had previously testified against defendant, was called as a witness at the aggravation/mitigation phase of sentencing. According to Jordan, defendant said he had secreted a gun over at the college, where he worked, and had one at his house as well. Jordan said defendant told him he did not intend to spend the rest of his life in prison if things went badly at trial. Jordan stated that defendant had a wire and could pick handcuffs. If convicted, defendant planned to pick his handcuffs in the tunnel between the courthouse and the jail, and go for a guard's weapon. Defendant also indicated he wanted to "get even" with Mark Stabler for testifying against him. Jordan said that defendant had saved articles about himself while incarcerated and awaiting trial.

Douglas Paul testified that he was one of defendant's good friends prior to June 12, 2001. When Paul was in defendant's apartment, prior to that date, he noticed an article pertaining to the June 1999 murder of Amy Warner in Charleston, Illinois. Defendant had the article posted on his wall. Defendant told Paul he had killed Warner. He referred to Warner as "white trash." Paul testified that, when he broke up with a woman in January of 2000, defendant asked him if he wanted defendant to "get rid of her." Paul stated he had seen defendant slashing the tires and seats of a Jeep after a party in July of 2000. Paul also remembered defendant yelling a

racial epithet at an African-American in their apartment building's parking lot. Paul said defendant called the other person a "stupid nigger," and defendant's action incited a physical confrontation. Defendant also told Paul that he had burned down an apartment building under construction across the street from his residence.

Brian Beavers, another friend of defendant, testified that he had observed defendant use a credit card to enter other people's apartments. Defendant also told Beavers, without prompting, that he had burned down the apartment building across the street. On another occasion, defendant told Beavers he had murdered a girl in 1999, though Beavers did not think he was serious at the time.

Kristi Dewitt testified that she was a part-time police officer for Rossville, Illinois, in December of 1997. Her husband was also a Rossville police officer. Defendant came to her residence one evening at 5:30 p.m. in December of that year, asking to speak with her husband. Dewitt told defendant her husband was busy and could speak to defendant when he went on duty at 6 p.m. Dewitt's husband was in the bathroom getting ready for work. Defendant said he "needed to speak with him *now*." After several verbal exchanges, Dewitt asked defendant to leave. Defendant then stepped toward her aggressively, and Dewitt positioned her eight-year-old son (who was present at the door during the exchange) safely behind her. Dewitt stepped forward and told defendant if he did not leave she was going to arrest him for trespassing. Dewitt said she felt threatened by defendant. Dewitt's husband heard the argument and came out to speak to defendant. Dewitt's husband had to tell defendant to leave more than once before defendant finally departed. Dewitt said defendant was very loud and demanding with *her*. When defendant left, he spun his tires and threw gravel.

Lisle Farnum testified that he and defendant were

"roommates and best friends" in the Marine Corps. Farnum went to Charleston to visit defendant after he entered college and saw, on a "billboard above the computer," an article about a girl who had been murdered in Charleston.

Jeremy Deck, Tara Hofer's cousin, testified that he socialized with defendant and Hofer for a time and often observed defendant enter locked apartments using a credit card. Deck saw a "poster" in defendant's apartment, mentioning Amy Warner.

James Rankin, a Coles County court security officer, testified that he had worked as a jailer in May of 2002 at the Coles County Safety and Detention Center. On May 28, 2002, defendant and another inmate were involved in an altercation. Defendant initially had the other inmate in a "bear hug," and the incident quickly developed into a "full out fight." Rankin ordered all the inmates to lock down, and everyone did except those two. By that time, the other inmate had gotten defendant in a headlock and was punching him in the head. Rankin yelled at them to break it up, and the other inmate put his hands back to give up. Defendant then put his arm around the other inmate's neck and hit him twice. Rankin called for backup and tried to stop the fight. Rankin told defendant to back off several times, to no avail. Defendant, who had the other inmate up against the bars of a door, asked Rankin if he wanted to take the other inmate's place.

Terry Tillis testified that he was assigned to the Coles County Safety and Detention Center on May 16, 2002, when another officer contacted him about a verbal altercation in one of the cellblocks. Inmates were yelling at correctional officers and throwing trays of food. The inmates were also cursing at the officers and refusing to deadlock. Defendant, who was involved in the incident, was subsequently moved to a high security cellblock and was disciplined as a result. Thereafter, on January 16,

2003, officers attempted to put an inmate who was considered a flight risk into a cell with defendant. Defendant refused to allow the inmate in his cell. Defendant told the officers there would be an altercation by the afternoon if they put the other inmate into the cell. Defendant's threats agitated the other inmate, so the other inmate was placed elsewhere. During the verbal exchange, a different inmate became "mouthy," and that inmate was moved to another cellblock as a result. Tillis felt that defendant's actions instigated the conduct of the offending inmate, something that had happened on prior occasions as well.

Anthony Lauletta testified that he returned to Charleston in February of 2000, after having been away for the weekend, and he saw that the structure across the street from his apartment building had burned to the ground. Defendant, who broached the subject in a joking manner, stated that he had burned it down. Lauletta noted that none of his other friends joked about burning down the building. Lauletta said defendant had stated he had been in all of the apartments in the building during Christmas break of 1999. Defendant also told Lauletta he had known Amy Warner personally. Lauletta knew defendant owned a handgun.

Christopher Howard was called as a witness and testified that he lived in defendant's apartment building. Howard said defendant was verbally abusive to defendant's girlfriend, Tara Hofer, calling her a "bitch" and a "cunt." Sometimes, after they argued, Hofer would come to Howard's apartment to cry and complain. On occasion, her neck would be red. Howard also testified that defendant had admitted setting the fire at the apartment building across the street. Finally, Howard stated that defendant owned a 9-millimeter handgun, which he kept in his apartment.

Hillary Spitz, a correctional officer with the Coles

County sheriff's department, testified that she was on duty on May 31, 2002, when defendant told her she "needed to come in his cell and scrub the walls." She replied that was not one of her duties. Later, defendant told her she needed to "sweep and mop the floors in the hallway." She replied she was not "his maid, his mother, or his nurse." Defendant began to respond, "But will you be my —," when Spitz cut him off and said, "Over my dead body." Defendant then stated, "That's okay as long as your body is still warm."

Kris Phipps, the assistant fire chief for the Charleston fire department, testified that, on February 13, 2000, he responded to a fire at an apartment building under construction in the 1100 block of Fourth Street in Charleston. Phipps said the fire was later determined to have been the result of arson. Damage to the structure itself was estimated at $3.1 million. Eleven other structures were damaged as a result of the fire, two of which were damaged so badly they had to be demolished. There were approximately 20 vehicle exposures, and several vehicles were destroyed. A backhoe, two forklifts, and a construction trailer were also destroyed.

Patricia Winborn testified that she lived in Charleston in June of 1999 and worked with Amy Warner. Winborn was also acquainted with Tara Hofer. Hofer worked at the day-care facility where Warner's children attended. Through Hofer, Winborn met defendant. Warner had two children: a four-year-old girl and a seven-month-old boy. Winborn baby-sat for Warner's children three weeks prior to the murder. Winborn cared for the children at Warner's house, and she invited Hofer and defendant over to watch movies. There were photographs of Warner in the house.

Winborn also testified that she had gone to a local tavern with Hofer and defendant one evening and, while Hofer was away in the restroom, defendant grabbed Win-

born's shirt and lifted it up to expose her breasts. Winborn was "pretty offended."

Adam Rhoads, a correctional officer with the Coles County sheriff's department, testified that on November 11, 2001, he responded to a fight in one of the cellblocks of the Coles County Safety and Detention Center. An inmate informed Rhoads that he had been in an altercation with defendant. The inmate had a scratch on his neck and a red, swollen left eye. The inmate told Rhoads he had taken exception to defendant ordering him around and defendant responded by punching him in the eye.

Sam Gaines, a correctional officer with the Coles County sheriff's department, testified that he was on duty on May 16, 2002, when defendant asked him what time it was. Gaines *estimated* the time because he did not have a watch. Defendant responded, "That figures, you're all fucking worthless." After defendant made that remark, another inmate also made an "uncomplimentary" remark. Then defendant and the other inmate used additional obscene language and began rattling the bars of their cells. Gaines turned off their television and said they could have their television privileges back when they calmed down. Defendant, in an "impolite manner," escalated his tone and things started to get out of control. Gaines had to summon help to quell the disturbance.

Jeff Marlow, an investigator with the Illinois State Police, testified that he met with Darsann Barker on February 4, 2002. Barker told him she had been the victim of a sexual assault that occurred when defendant was in the Marine Corps and stationed in California. Barker, an airline stewardess, had met defendant in 1996, and a relationship developed which continued for several weeks. That relationship eventually resulted in consensual sex on March 16, 1996. Barker stated she had been a virgin prior to that encounter. She described the episode as "rough sex." Barker said defendant was mean to her

afterward and told her she "wasn't any good." Nonetheless, defendant later asked her to meet him at Camp Pendleton, where he was stationed. When she arrived, defendant was there with two of his friends. He asked her to go into a bedroom, where he had placed a blanket on the floor. He then forced her down on the floor, removed her tampon, and forced her to have sex against her will. Barker related that she cried throughout the attack. After defendant was finished, he went back into the other room with his friends. He then referred to her as "white trash." Barker said she reported the assault to the authorities at Camp Pendleton, but she did not pursue charges against defendant.

Kimberly Lille testified that she lived in defendant's apartment building in May of 2001. Lille stated she woke up one night in May of 2001 and heard sounds coming from defendant's apartment. Then she heard "footsteps down the stairs" and "thumping, like chasing." Lille got up to see what was going on. When she looked out the window, she saw Randi Morris, with whom defendant had a relationship, sitting in a car. Morris was crying and disheveled. Defendant was standing by the car, holding the door open.

Randi Morris testified that she dated defendant in May of 2001. The relationship lasted two weeks. Morris ended the brief relationship on May 26, 2001. Morris had consensual sex with defendant twice. During those encounters, defendant bit her on the neck, which left a "very massive bruise," and on her leg and under her buttocks, which also left a large bruise. On the evening of May 25, 2001, Morris went to defendant's apartment, where a group of people had gathered. At one point in the evening, defendant and a female started wrestling. Defendant threw the woman down on his coffee table, breaking it. Defendant was also pulling the woman's hair. Eventually, everyone left and she was alone with defen-

dant. They engaged in foreplay. Morris stated she was naked, except for high heels. Defendant placed Morris on her stomach and positioned himself as if he were going to penetrate her anally. Morris told defendant she did not want to do that. Notwithstanding, defendant penetrated her anally. Morris stated she had previously told defendant unequivocally that she would not engage in anal sex. When defendant penetrated her, she experienced "extreme pain" and was frightened because defendant was forcing himself on her. Morris screamed "no" and kicked at defendant. Defendant responded by placing his hand over her mouth and shoving his fingers up so they covered her nose. Morris testified she could not breathe. When Morris opened her mouth, defendant got his finger into her mouth, and Morris bit him, trying to get him to stop. Morris said she was yelling at defendant to get off of her. Defendant grabbed her head and forcefully turned it as far as he could to the right. Morris heard her neck cracking. She stated, "It was like he was trying to break my neck." Morris screamed, and defendant quickly turned her head the other way forcefully. Morris heard her neck crack again. She testified, "And I—all I could think of was praying so hard, Lord, please don't let me die this way, he's trying to kill me. I knew he was trying to kill me. I mean, he was trying to break my neck." Morris eventually turned on her back and pleaded with defendant not to kill her. He then relaxed his hold on her. Morris testified, "[A]ll I could think of was to get out of there because he had tried to kill me and I just wanted to get out of there and get safe."

She tried to be nice to defendant, making excuses that she had to go to work early, but defendant told her, "You're not going anywhere." Morris told defendant she had to go to the bathroom. While she was inside, defendant stood outside the bathroom door. Morris determined that the bathroom window was too small for

her to escape through it, and she realized that defendant's apartment was on the second floor anyway, so she wiped the blood from her anus, came out of the bathroom, and got dressed. Defendant still insisted that Morris could not leave, so Morris sat down in a chair. Defendant then grabbed her by the legs, pulled her onto the floor, and again tried to have sex with her. When she resisted, he finally gave up. Morris kept insisting that she had to go. Defendant then said *he* had to go to the bathroom, and he grabbed Morris by the wrist and made her go into the bathroom with him. When he finished, he asked Morris to lie down with him and sleep.

Morris waited until defendant was asleep, then she jumped up and opened the door. Defendant woke up and tried to stop her from leaving, but she eluded him and ran down the steps to the front door, with defendant in pursuit. Morris got in her car and tried to shut the door, but defendant prevented her from doing so. He tried, unsuccessfully, to take her keys, then he reclined her seat and tried to get on top of her. Eventually, Morris succeeded in raising the seat, closing the door, and starting the car. Defendant jumped into the backseat, and then crawled into the front passenger seat. He said he was sorry, that he could not remember what he had done. He refused to get out of the car, so Morris drove to her apartment with defendant in the vehicle. When she arrived at her apartment building, defendant followed Morris to her apartment and forced his way inside. He laid down on her bed and pulled her down beside him. She waited until defendant fell asleep, then she left for work. Defendant was gone when she returned.

Morris stated she was very sore after the incident. Her anus was painful from the sexual assault, and her back and neck hurt as if she had been in a car accident. She did not contact the police because she was afraid they would not believe her and she felt humiliated. After

defendant was arrested for McNamara's murder, Morris contacted the police and told them what had happened to her. Following the sexual assault, Morris saw defendant at social gatherings, but she made sure she was never alone with him again.

Morris said defendant told her the Marines taught him to kill without remorse. At the time, Morris thought the comment odd, and she was not sure what defendant meant. Morris noticed that defendant had books about Hitler and Nazism. Defendant possessed books entitled, Pipe and Fire Bomb Designs, The Anarchist's Cookbook, SS: Blood Soaked Soil, Hitler's Enforcers, Mein Kampf, as well as Marine Corps training manuals. Defendant told Morris he respected Hitler for trying to "purify his race."

The State next called Keri Guillory. Guillory knew defendant through her boyfriend, Brad Adams. Adams had been in the Marines with defendant. Adams resided with Guillory in Louisiana, and defendant would come to visit during the Christmas holidays. When he did, defendant stayed at Guillory's residence. On his second visit, defendant brought his girlfriend, Tara Hofer. Guillory said that defendant treated Hofer badly and would talk down to everyone. When he got drunk, he got mean. She did not want him to come back after his second visit.

When he returned for Christmas of 2000, defendant was drunk every day. Defendant kidney punched her twice in a bar. Circumstances dictated that she take him to a family friend's home while Adams was at work. Guillory testified, "[The] next thing you know he is whispering in my sister's ear." Guillory's sister was 15 or 16 years old at the time. Guillory testified she had to pull defendant away from her sister. Later, defendant put his hand on the inner thigh of an older woman of the household. When she got up, defendant spilled his drink on the carpet.

When Guillory got defendant back to her house, defendant fell going into the house and bloodied his eye. Guillory tried to attend to his eye, and defendant began screaming at her. Defendant shouted, "Don't you know how much Brad loves you," and he pushed her away. Guillory tried to get out of the house, but defendant tackled her and forced her to the kitchen floor. Guillory testified defendant put her in "some kind of a hold." He put his fist in her mouth and, in doing so, scratched her mouth and face. Her gums were torn and the back of her throat was scratched and raw. Guillory escaped from defendant when her dog distracted him. She ran out the door and called the police from a neighbor's house. The police arrived, as did Adams. Defendant was arrested, but Guillory dropped charges at Adams' request and upon his assurance that she would never have to see defendant again.

The State presented testimony that defendant's computer was seized, pursuant to a search warrant, on the day of his arrest for the McNamara murder. Computer data analysis revealed that defendant had logged off his computer at 3:29 a.m. on June 12, 2001, the morning of Shannon McNamara's murder. Defendant's Yahoo identification name was "Cereal Kilr 2000."

On defendant's computer, an Illinois State Police analyst found images of adult females posing nude or involved in sexual activity. Some images depicted adult females engaged in sexual activity with a dog and a horse. There were also images of nude children and sexually explicit cartoons. On June 11, 2000, someone accessed information on date rape. On June 11, 2001, someone went to a website and read articles about Timothy McVeigh's trial and activities, and examined articles pertaining to the manufacture of methamphetamine.

Sergeant Kevin Paddock of the Charleston police department testified that he executed a search warrant

at defendant's apartment and observed various books defendant possessed. Paddock stated that defendant had books entitled, Pipe and Fire Bomb Designs, The Anarchist's Cookbook, SS: Blood Soaked Soil, Hitler's Enforcers, Mein Kampf, as well as Marine Corps training manuals.

Paddock was also involved in the investigation of the murder of Amy Warner in Charleston on June 29, 1999. Warner was found dead in her apartment, her throat slashed, her children in an adjacent bedroom. At the time of the murder, defendant lived less than a mile from Warner's house.

Joe Siefferman, a field supervisor for the Illinois State Police, testified as an expert in crime scene reconstruction. Siefferman was involved in both the McNamara murder investigation and the investigation of the Warner homicide two years earlier. Siefferman described the scene of the Warner murder and identified photographs depicting the crime scene. Siefferman noted that Warner was found lying partially on her couch and partially off. Her feet and torso were on the couch; her head was off the couch on a cushion on the floor. Her arms were outstretched above her head. She was wearing a pink T-shirt, but was otherwise naked. She had what Siefferman described as a "very large cut on her throat" that resulted in a significant loss of blood. Indeed, photographs show that Warner's throat had been slashed from one side to the other. Warner had defensive wounds on her left hand. The physical evidence indicated that Warner was positioned facedown when her throat was cut. Her body was turned over after her throat had been cut so that her wounds and the front of her body would be exposed. In Siefferman's opinion, Warner's injuries were intentionally exposed for effect.

Siefferman noted several similarities between the Warner and McNamara murders. First, both victims ap-

pear to have been posed. In each instance, photographs reveal a victim lying on her back with her arms extended above her head. In each instance, the victim was naked from the waist down. Both were attacked in their sleep. Both victims sustained injuries from sharp objects. In neither instance were identifiable fingerprints found.

On cross-examination, Siefferman acknowledged that McNamara died from strangulation and suffocation, whereas Warner was killed by *slashing* her throat. He also acknowledged that the washcloth found near Warner's body may have gotten there when her four-year-old daughter attempted to wipe the blood off of her mother and wake her up.

Mike Nichols, the coroner of Coles County, testified that Warner died of "massive blood loss" as a result of a "massive incise wound" of the neck. Autopsy results indicated there were recent contusions to the victim's vagina, which, the autopsy report concluded, may have been the result of nonconsensual vaginal penetration.

Patrick Callaghan testified that he was previously employed with the Illinois State Police and had been involved in both the McNamara and Warner murder investigations. He noted similarities in the two murders and began looking for connections between defendant and Amy Warner. He first learned that Doug Paul had indicated defendant had admitted murdering Warner. Investigators then learned from Patricia Winborn that defendant had been in Warner's house approximately two weeks before the murder. Tara Hofer was interviewed and told investigators she had to go to bed early on the night of the murder and defendant had stayed up late. She said she remembered the date because Warner's children went to the day-care facility where she worked and the murder was "all of the talk the next day." Callaghan testified, when he interviewed Hofer in August of 2001, Hofer told him she would love defendant even if he had murdered McNamara and Warner.

James Wright was called by the State to testify as an expert in the field of crime scene investigation. Wright stated that he was employed by Threat Assessment Group as a consultant on violent crime. He had previously worked 30 years for the Federal Bureau of Investigation (FBI), and of that, 25 years as a special agent. Wright testified he had investigated homicides, rapes and arsons. As part of his duties, Wright reviewed crime scene and autopsy photos, reviewed police reports, and interviewed witnesses. He interviewed admitted murderers and rapists, and he consulted with experts in the fields of psychiatry, psychology, and medicine. At one point in his career, he was transferred to the behavioral science unit of the FBI. While there, he began a research project pertaining to serial rapists. As a part of that project, Wright conducted interviews of serial rapists in sessions lasting from 8 to 16 hours. The in-depth interviews focused upon the subjects' social histories and behaviors. After the interviews, he and other researchers reviewed the subjects' records to corroborate information they had gathered. Wright testified he had been with Threat Assessment Group for 4 1/2 years. During that period, he had been called upon for consultation in murder cases.

In the instant case, Wright was asked to review autopsy photos, crime scene photos, police reports, and witness statements, pertaining to the murders of Shannon McNamara and Amy Warner. With respect to the apartment building fire, Wright was provided with police reports, photos, and reports of the Bureau of Alcohol, Tobacco, Firearms and Explosives, and the Charleston fire department. Wright was asked to make comparisons and look for similarities in the two murders and the arson. Wright was also provided with a criminal history of defendant, a record of his contacts with police, as well as his military and educational records.

Wright said what he does is not a science. Rather, it

is assessment and analysis based solely on years of training and experience. The State tendered Wright as an "expert in the area of criminal investigation, particularly with regard to crime scenes."

Under cross-examination, Wright stated he had been initially asked in this case to compare the crimes and say "whatever [he] could about the individual that committed the three crimes or if they could possibly be connected." Wright was later requested to evaluate the crimes, evaluate defendant, and render his opinion as to whether defendant was responsible. Wright testified there were approximately 25 or 26 doctors, psychiatrists, and psychologists who work with his company as consultants on their cases.

At the conclusion of defense counsel's questioning, counsel objected to Wright being qualified to testify as an expert. The trial court overruled defendant's objection, and the State proceeded with direct examination.

Wright testified that crimes can be categorized as "organized" or "disorganized." In an organized crime there is evidence of preplanning, such as selecting a target and bringing a weapon. In a disorganized crime there is no indication of preplanning, and the crime scene "looks a lot sloppier." Wright stated that a crime might start out organized and become disorganized if the perpetrator meets unexpected resistance or is interrupted.

Wright characterized the McNamara murder as a "mixed crime scene." There was evidence of organization and preplanning in that latex gloves were used to keep from leaving fingerprints, and there was reason to believe an effort was initially made to enter the apartment by "slipping" the door lock with a credit card that was found at the scene. When that plan was thwarted by a deadbolt, an alternative plan was utilized, *i.e.*, cutting the window screen with a box cutter to gain entry. Wright

believed that was a sign of a fairly organized person who, when confronted with something unexpected, can recover and alter the original plan or use an alternate plan. Moreover, there was evidence that defendant had been watching the people who lived in that apartment, which was, again, a sign of preplanning and organization.

However, when defendant encountered unexpected resistance, the crime became disorganized, and defendant left evidence behind. Wright testified there were "indications of anger" in the commission of the offense, particularly, "the probable stomping [of] the body to lacerate the liver." Defense counsel objected on the ground that Wright had "no psychological training or background" to make "those kind of assessments." The court overruled the objection, and Wright continued:

> "[A]nger can be *** caused by a lot of different things. But certainly somebody resisting robs somebody of control and tends to make people who like to have control very angry at the person that takes that control from them."

Wright testified it appeared defendant regained his composure after the struggle was over. He disposed of the murder weapon in a dumpster and was later seen putting a handgun in the ceiling of a janitor's closet in the gymnasium where he worked.

Wright noted that the Warner murder appeared to have been much more organized. There was a lesser degree of resistance. Warner was apparently caught totally by surprise and quickly overwhelmed. Wright noted there were wounds to the neck of both victims. Similarly, Wright observed, reports from other young women who had violent encounters with defendant indicated the throat had been a point of attack. Wright pointed out another similarity between the McNamara and Warner murder scenes: in each instance, the victim's arms were extended over her head.

Speaking of the attributes of arsonists, Wright noted that studies indicate arsonists experience a "sense of

power and control" in setting a fire, particularly a large fire. Wright observed that, in defendant's interaction with police, he was commonly uncooperative, belligerent and combative. Wright stated defendant's history of activities with law enforcement officers demonstrated a lack of respect for authority.

Wright also commented on the newspaper article on the Warner murder that defendant had posted in his apartment. Wright went on to testify that serial killers and serial rapists tend to keep articles about the crimes they commit.

Wright testified, over objection, that defendant's history showed a lot of anger toward women. He stated his belief that past behavior is the best indicator of future behavior.

Wright noted that the consumption of alcohol was often a factor when defendant engaged in inappropriate behavior; however, his violent and aggressive conduct continued even after he was incarcerated. Moreover, Wright noted both the McNamara and Warner murders exhibited preplanning. The preplanning of the McNamara murder in particular shows that defendant was "thinking fairly straightly" when he committed it. He was not in a drunken stupor.

Wright testified that he was familiar with the Anarchist's Cookbook, which explains "how to make bombs, how to kill people, how to disrupt government, how to be an anarchist."

On cross-examination, Wright admitted there were dissimilarities between the two murders. For example, Warner's body was not mutilated to the extent that McNamara's was. Moreover, there was no evidence of forced entry in the Warner murder. Wright maintained that defendant was likely to repeat his conduct in the future since he was "seemingly unable to learn from his mistakes."

On redirect examination, Wright again acknowledged there were differences in the Warner and McNamara murders, one being the postmortem mutilation of McNamara's body. Wright insisted that postmortem mutilation of a body is an expression of anger. Wright testified a killer may display or pose the body of a murder victim to shock, to show disrespect for the victim, or for a "few different reasons." As to defense counsel's suggestion that defendant's violent behavior may have resulted solely from his consumption of alcohol, Wright observed that "drugs and alcohol are available in prison."

After the victim's mother, Cindy McNamara, presented victim impact testimony, the State rested, and the defense commenced its case in mitigation.

The defense first called Allen Mertz, defendant's father. Mertz testified that he separated from defendant's mother around the time of defendant's birth. He soon got custody of defendant and his siblings, and the children initially went to live at his mother's house. After Mertz acquired a suitable house, and he met the woman he would eventually marry, the children moved in with him. Defendant was not quite five years old. Mertz stated that defendant attended Rossville Methodist Church as he grew up. Mertz thought he had a "fantastic relationship" with defendant. The family would go fishing together, and though he worked long hours, Mertz would occasionally make it to defendant's football games. Mertz stated, for defendant's eighteenth birthday, he got defendant a tattoo.

Defendant's paternal grandmother, Dorothy French, testified that defendant came to live with her when he was still in diapers. After that, defendant's natural mother essentially had no contact with him aside from sending him an occasional birthday card. French stated that defendant lived with her until he was in the "third or fourth grade." He stayed with her two or three years

after his sisters went to live with their father. Even after defendant went to live with his father, she still saw defendant on weekends. She attended defendant's school functions. She described defendant as: "Just like any boy, out playing, digging in the dirt, and riding bicycles." Defendant's grandmother identified various family photos, including one of defendant and his father when defendant graduated from high school, and one of defendant with a birthday cake when he was 16 or 17 years old.

French testified that defendant attended Sunday school regularly, and had a perfect attendance for 12 or 13 years. French took defendant to church, and defendant's father would attend church programs in which defendant was involved. French described defendant as a "good boy" in high school. He got good grades and participated in football. He left Rossville after graduation, when he joined the Marines. After that, she saw him when he came home on leave, as he would usually stay at her home. He often wrote her letters and called her. After the Marines, defendant attended college at Eastern Illinois University, and visited her on the weekends. She stated, "To him, I'm his mom." French did not believe that defendant was changed by his experience in the Marines.

Brandy Mertz, defendant's youngest sister, initially testified that she had "trouble remembering things at times." Asked why, she stated, "I believe it's because of my stepmother hitting my head into the wall." Defense counsel then asked her: "You don't know that but you think that?" Brandy responded affirmatively.

Despite her problems with recall, Brandy testified that she, defendant, and their older sister, Christina, did not get along well with their stepmother when they were children. Brandy testified: "She was mean to us. She abused us." Brandy said that their sister, Christina, was

good to her and to defendant, she took care of them, and she acted as their mother. According to Brandy, their stepsister, Rose, was also mean to them, and sexually abused her. Brandy said she did not tell her father because he would not have believed her. She stated that her father and stepmother had a sign on their bedroom door prohibiting entry. According to Brandy, her step-brother, Bruce, also tried to sexually abuse her. She acknowledged the first time she ever told anyone about having been sexually abused was a month before trial, when she "overheard [defendant] and Christina talking about it, about them being sexually abused by Rose."

On cross-examination, Brandy admitted that, despite the alleged abuse she had suffered, she had never been arrested and had never committed violent crimes against another person.

Michael Mahorney, defendant's uncle, was called to testify, and was initially questioned about the details of Mahorney's alcohol consumption. Mahorney stated, earlier in his life, he had consumed between one and two cases of beer a day. He claimed, later in life, he drank "three to four fifths a night plus a six-pack or twelve pack of beer and three or four shots of tequila. And that was seven nights a week." Mahorney said, at the time of trial, he consumed perhaps one beer every two months. Mahorney testified that defendant's father usually drank brandy or beer, and Mahorney had only seen defendant's father drunk on one occasion. Mahorney acknowledged, despite heavy drinking during a portion of his life, he had only been arrested on one occasion, for illegal consumption of alcohol, and his drinking never resulted in violent behavior.

Speaking of defendant, Mahorney described his nephew as a "typical boy," who engaged in normal activities. Mahorney saw defendant frequently when he was growing up—every weekend or every other weekend—

and Mahorney attended birthday or anniversary parties where defendant was present.

Lisa Masengale testified that she attended church with defendant when she was growing up, and they were friends in high school. Defendant was interested in history in high school, and he loved to read. He was protective of underclassmen, and was himself picked on to some extent. He was "not the most popular guy." After high school, she corresponded with defendant while he was in the Marines, and saw him occasionally when he was in college. In college, he attended Bible classes for awhile. He always had a strong connection to church and family. Though she had seen him drunk, and had seen him use drugs, she had never seen him angry. She had always seen defendant treat his girlfriend, Tara Hofer, with respect.

Darlene Edwards testified that defendant is her step-grandson and she "knew him from his first two or three years" when he was "with his mom." According to Edwards, when defendant cried, instead of picking him up and feeding him, his mother screamed at him and let him cry. Defendant's mother was a "very messy housekeeper" and did not keep her children clean. Edwards testified to occasional and moderate drinking by two members of defendant's maternal lineage.

Myron Ward testified that he had been defendant's high school history teacher. He remembered defendant as an average to slightly below average student, and one who was, perhaps, indifferent to, or not interested in, history. Ward said defendant was not exceptional as a disciplinary problem, but he did share the details of one incident when defendant shot a rubber band at him and defendant, when confronted by Ward, made an inappropriate remark. Ward said, after defendant got out of the service, he came to visit Ward in the classroom, and defendant said "something to the effect that he was sorry

about some of his less than disciplinary manner in high school." Ward explained, upon cross-examination, "I don't know if he apologized so much as he expressed that he wished he had done better." David McDonald, defendant's physical education teacher and football coach in high school also testified regarding defendant's participation in those programs.

Ian Tuggle testified that he and defendant were friends as children. They fished and played together. Tuggle visited in defendant's home "just about every day" and knew defendant's sisters and stepsiblings. On one occasion, when Tuggle stayed overnight at defendant's house, Tuggle waited until defendant and his stepbrother, Bruce, were asleep, then went into the bedroom of defendant's stepsister, Rose, and had sex with her. Tuggle was 10 or 11 years old at the time, and Rose was five years older. Tuggle testified he did not feel the experience with Rose was "anything negative at all." He had not experienced any problems later in life because of it. Tuggle stated that he and defendant had always been friends, and defendant had not had any problems with anyone in high school. He was just an "average kid."

Jennifer Walker tutored defendant in Spanish at Eastern Illinois University. She also saw defendant when he went to church at the Wesley Foundation in Charleston. Defendant told her a little about his life and indicated his parents "weren't very involved with him." He reminded her of someone who had had a difficult life. There was a barrier that made it difficult to get to know defendant. On cross-examination, Walker acknowledged that she had not regularly socialized with defendant; she had only visited with him twice after services.

Kathy and Jerry Douglas testified on defendant's behalf. They met defendant when his grandmother first brought him to church. He was one year old. Kathy Douglas described defendant, in his early years, as "cute and

ornery, funny," but not a discipline problem. She described defendant's grandmother as "giving and caring," someone who worked hard and lived for her family. Kathy Douglas stated that defendant was very devoted to his grandmother; there was a special bond between them. Jerry Douglas agreed that defendant was very affectionate toward his grandmother. Kathy Douglas said that defendant seemed to know where he was going and what he wanted to do after he came back from the Marines. After defendant returned from the Marines, Jerry Douglas hired defendant as a farm laborer. Although defendant missed some days at the end of his term of employment, Douglas considered him one of the best workers he had, someone Douglas could trust to do as he was told.

Michael Shirley, defendant's undergraduate advisor and history professor at Eastern Illinois University, testified that defendant was a "little above average" in academic ability. Shirley did not notice anything out of the ordinary in defendant's interactions with other students. Shirley recalled an occasion, when he had asked defendant about a paper defendant had neglected to turn in, that defendant said he was an alcoholic and was "having some problems." Shirley asked defendant if he had ever been to Alcoholics Anonymous, and defendant replied that he had. Shirley told defendant he should probably start going again. Defendant, who normally smiled and laughed when he spoke with Shirley, was initially impassive during their discussion, but later started crying.

Tara Hofer testified that she used to live with defendant and, on one occasion, in 1999, he was physically abusive to her. Hofer recalled a shopping trip to Terre Haute, Indiana, when she and defendant passed the federal prison where Timothy McVeigh was housed. Hofer said defendant made no comment about McVeigh.

Hofer testified that defendant had nightmares and his mood was "up and down" during the year that she lived with him. He was sometimes verbally abusive. He drank, heavily, three or four times a week. Sometimes, his attitude toward her changed when he drank. He was kind to her when he was sober. On occasion, after defendant drank, he could not remember what he had done the night before. She told him he needed help, but Hofer said she "couldn't force him to do it." Defendant did go to Hour House, which Hofer "guessed" was a rehabilitation center. In addition, defendant occasionally went to the Veterans Administration hospital, where defendant was given Prozac and Paxil for depression.

Hofer said she had visited with defendant's family. Defendant got along well with his father, but there was tension between defendant and his stepmother. Defendant called his grandmother "Mom."

Hofer testified that defendant came to bed at 2 a.m. on the night of the Warner murder, and he was not drinking that night. Hofer said she would have awakened if he had gotten out of bed after that. Hofer stated she did not notice defendant get out of bed on the evening of the fire either. Under cross-examination, Hofer admitted she had not told Agent Callaghan that defendant had been in bed with her all evening the night of the Warner murder. Hofer said the articles concerning date rape on defendant's computer were ones *she* had downloaded for a class presentation. She testified that other people also used defendant's computer.

Lisle Farnum, a friend of defendant's from the Marine Corps, testified that defendant achieved the rank of lance corporal in the Marines. Farnum generally described their duties and activities while in the Marines. He described defendant as an excellent Marine. He said defendant was disciplined, fair and honest. He had strong leadership skills and "a good mind for organization."

Farnum also testified that they were given shots and pills prior to overseas deployments to prevent, among other things, malaria. Farnum said the regimen of drugs they were required to take made him "really sick." Farnum also testified that the Marines had a suggested reading list, and Mein Kampf was one of the books on that list. Farnum said they drank a lot in their spare time, and fought a lot.

Under cross-examination, Farnum stated they had last received shots and pills in 1997. Farnum did not experience any lasting problems as a result of the medication given to him in the Marines. Moreover, he acknowledged that his Marine experiences did not cause him to fight with women.

Rosella Ray testified that she had known defendant since he was a little boy. She was his Sunday school teacher and his "faith partner" for confirmation. Ray said defendant treated his grandmother with great love and respect. Under cross-examination, Ray acknowledged that defendant had the support of his church and a loving grandmother as he grew up and throughout his years in high school.

Summer Jacobsen Summers testified that she met defendant in August of 1996 and they dated for several months. They had a sexual relationship, which Summers described as "emotional." At that time, defendant was not aggressive sexually. Defendant helped her with her young daughter, and she considered the three of them a family unit. Summers had seen defendant drunk, but never violent. She ended the relationship when he went overseas, but she kept in contact with him. She described defendant as "intelligent, hard working, organized, supportive, caring."

Lisa Hislop met defendant in a bar in 1999. They later dated and the relationship eventually evolved into a sexual one. She described defendant as "affectionate,

cuddly, passionate." Hislop saw defendant drunk, but never violent. Even after the relationship ended, she kept in touch with defendant. She visited defendant after the Keri Guillory incident. Defendant said he could not remember what had happened.

Under cross-examination, Hislop admitted she met defendant while he was still dating Summer Jacobsen Summers, but defendant did not tell her about Summers. Hislop e-mailed defendant at "Cereal Kilr 2000." Defendant told her the e-mail address "was something he read or saw on TV."

Brad Adams met defendant in the Marines and they remained friends thereafter. Adams was defendant's roommate in Camp Pendleton. After their first deployment to Okinawa, they began to drink "excessive amounts." At one point, defendant would drink a fifth of whiskey and a case of beer during a single session of drinking. Defendant became violent when he drank. Once, defendant got into a fight with a sergeant and Adams had to physically restrain defendant, punching him a couple of times in order to subdue him. The next day, defendant did not remember what had happened. He later spoke with the sergeant, who did not ultimately file charges. Adams said there were many occasions when defendant could not remember what had happened the night before. When drinking, defendant could be obnoxious, irritating, and hard to control. Adams said he knew Darsann Baker. According to defendant, it was *Baker* who was out of control at Camp Pendleton. Adams said the military police had to subdue her. Adams admitted he and defendant got into trouble for methamphetamine use while in the Marines.

After he got out of the Marines, Adams lived in Louisiana with Keri Guillory. After defendant's second visit with them, Guillory complained that defendant was irritating and disrespectful. During defendant's third

visit, defendant became violent. He hit Guillory in the kidneys at a bar, and later attacked her in her home.

Adams said defendant had headaches frequently, and he took a lot of prescription drugs. Defendant talked about militia groups in the news. Asked what he said about them, Adams responded, "[I]t wasn't anything abnormal."

Summing up defendant as a Marine, Adams stated: "You could trust [defendant]. You knew he had your back. You knew he could carry his own. He wasn't going to drop the ball and you could depend on him."

Under cross-examination, Adams acknowledged he took the same medication for malaria that defendant took before his overseas deployment, yet Adams had not been charged with violent crimes and had adjusted well to civilian life after his time in the military. Adams admitted defendant had been demoted in rank as a result of his methamphetamine use. Adams further acknowledged that defendant had been ordered into rehabilitation, against his will, and that he continued to drink afterward. Defendant was violent when he drank. Adams conceded that defendant was disrespectful to his girlfriend, Tara Hofer. Adams said he asked Guillory to drop the charges against defendant, which resulted from defendant's attack on Guillory. Adams tried, unsuccessfully, to get defendant to apologize to Guillory.

Daniel Cavallini testified that he owned Cyber Data, a business specializing in computer evidence and data recovery. Cavallini noted, under certain circumstances, an Internet user would not need to have a password. If, for example, a computer is already logged on to the Internet, no password would be necessary. Cavallini also testified that a person engaged in data recovery could not tell who was responsible for the temporary Internet files on defendant's computer. Although pornography was *viewed* on the computer, no pornography was *saved*

in a separate file. Cavallini acknowledged that he found articles on the computer concerning the manufacture of methamphetamine and racism. He found multiple pictures of Nazi war flags and symbols, as well as files pertaining to "White Pride Worldwide." Cavallini admitted that the Illinois State Police had "followed sound forensic principles" in their analysis of defendant's computer files.

Christina Mertz, defendant's older sister, testified that she, defendant, and their sister lived with their natural mother prior to moving in with their grandmother. She stated that her mother's house was dirty, insect-ridden, and cold. She felt wanted and loved when they lived with her grandmother.

When their father remarried, they moved in with him. He worked long hours and they really only saw him on weekends. Their stepmother was prone to mood swings and rarely came out of her bedroom. The children were not allowed in their parents' bedroom. The children stayed away from their stepmother as much as possible. Christina described an incident in her youth when her stepmother made her take off an outfit—which her stepmother deemed unacceptable—in front of her step-brother and his friend. She was wearing only a bra and panties underneath the outfit. Christina testified that their stepmother punished them by spanking them with a "switch from a tree." Christina said she tried to take the blame whenever possible to protect defendant and Brandy.

When defendant was in the Marines, he told Christina he thought he had a drinking problem, and would try to quit, but he just continued to drink. She tried to get defendant to participate in a residential program with the Veteran's Administration before he went to college, but defendant refused. Christina said her uncle Mike also had problems with alcohol, as did two cousins, though she did not provide details.

Christina described her family as the "epitome of dysfunctional." She claimed, a few years prior to her testimony, defendant told her he had had a sexual encounter with their stepsister, Rose. Although Christina had never seen defendant with their natural mother, she acknowledged that defendant was very close to their grandmother. She remembered defendant as a "goofy little boy who was always happy up until *** around junior high school."

Under cross-examination, Christina admitted that she—notwithstanding her difficult childhood—has had a successful career in, and associated with, the Air Force. Moreover, she noted that defendant was able to control his drinking, or even abstain, when he visited her.

Barry Hargan, a forensic consultant focusing on substance abuse evaluations, testified that he rendered opinions on "addictive disorders," and he conducted a study of defendant. As a part of that study, Hargan spoke with defendant and his sister, and reviewed defendant's "records." Hargan determined that defendant satisfied the criteria for alcohol dependence. Moreover, Hargan believed defendant's dependence was genetically influenced. He stated there was "a family history on both sides of the family including his father, his uncle, his grandfather, and there was also suspicion that his mother was also involved in alcohol abuse too." Hargan concluded, "[T]he family history was quite significant from a hereditary or genetic perspective that Mr. Mertz's alcoholism was genetically influenced." Hargan also addressed the phenomenon known as an "alcoholic blackout." Hargan testified that a "blackout" refers to a state of mind during which the intoxicated person is unable to form memories of what he or she is doing during the period of intoxication.

Under cross-examination, Hargan acknowledged that he had considered information contained in the reports

of Dr. Park Dietz—who had examined defendant in order to address a possible voluntary intoxication defense—and Dr. Jerry Boyd—who had evaluated defendant for fitness prior to trial—as well as that of James Wright. He *cited* the report of Dr. Boyd. He had not been provided a transcript *or* the tape recording of Dr. Dietz's interview with defendant. Upon further questioning by the prosecutor, Hargan explained that an "alcoholic blackout" refers only to the failure of the mind to permanently record memory; it says nothing about a person's ability to think, act, plan and organize while intoxicated. Moreover, Hargan acknowledged that defendant, in his interview with Dr. Boyd, had stated he "only rarely" had blackouts. Hargan responded that defendant may have been minimizing his history in that regard.

Jack Smith, a private investigator retained by defendant's attorneys, testified that he went to defendant's apartment in July of 2001. He noted that some of the books and compact discs removed from defendant's apartment bore innocuous titles. It was stipulated that there were no compact discs by a band called Serial Killer. Michael Dennis, a mitigation investigator for the defense, testified that he received a letter from defendant's mother in which she stated that she had no contact with defendant because his father would not permit it.

Defendant took the stand to testify in his own behalf. Defendant testified that he could not remember his natural mother. His first memory was living with his grandmother. Speaking of his time with his grandmother, defendant stated, "Everything was perfect." He considered his grandmother his mother, and his grandfather his father. He went to church and Sunday school with his grandmother every Sunday. He had perfect attendance for 13 years. Defendant said he attended church from the time he started going with his grandmother until the week before he was arrested.

Defendant testified that he went to live with his father when he was five or six years old. The house was run-down and disorganized inside. He shared a room with his stepbrother, Bruce, with whom he did not get along. Defendant said he and his sisters were not treated as well as his stepsiblings. Bruce constantly picked on him, and he and his sisters were punished for things they did not do. Defendant said he was sexually molested by his stepsister, Rose, a year or two after he moved in. Defendant testified he was around eight or nine years old at the time. According to defendant, Rose asked him to come to her room, where she undressed him and fondled him. Defendant said she then got on top of him and tried to insert his penis into her vagina. Defendant testified that happened several times.

Defendant claimed that his father had struck him several times. However, he also stated he did not see his father much. He said he saw his father strike his stepmother a few times as well. His stepmother usually stayed in her bedroom and kept a sign on the door advising the children to keep out. His sister, Christina, was basically his mother until he graduated from high school.

Recalling his years in high school, defendant identified his favorite class as history. He acknowledged the incident in history class when he shot rubber bands at the teacher and then made an "untoward remark" when confronted by the teacher. Defendant said he went back and spoke to his teacher about that incident six years later. Although defendant's father did not attend his football games, his stepmother attended one. His father and stepmother did attend his high school graduation. Defendant stated his goal upon graduation was to get out of his parents' house. His father got him a tattoo for his eighteenth birthday, and defendant got drunk to celebrate.

Defendant joined the Marines upon graduation, and

he testified he enjoyed the regimented lifestyle. However, after a few months he and his friends began to drink heavily. Defendant said they would get "falling-down drunk" on weekends, and they would occasionally experience blackouts. Defendant testified at length about the drinking and fighting of his days in the Marines. Defendant also testified regarding his use of methamphetamine. Defendant said he had already been cited three times for drinking when he tested positive for methamphetamine. He had already been reduced in rank from corporal to lance corporal for drinking. After the positive test for methamphetamine, he was court-martialed and reduced in rank from lance corporal to private, and was sent to the brig for 30 days. After that, defendant was discharged from the Marines. Defendant attributed his demotions solely to his inability to cope with alcohol. Notwithstanding his disciplinary problems in the Marine Corps, defendant said he did receive various commendations and certificates as well.

Defendant stated there were periods of time in the military when his drinking was somewhat in check. According to defendant, Summer Jacobsen Summers and Lisa Hislop helped him to stay sober. Defendant said he dated Summers after his first overseas deployment, and he was "madly and deeply in love with her." Defendant stated they "pushed each other apart" shortly before his second deployment, and he was heartbroken at the breakup.

Defendant participated in counseling and an inpatient treatment program during his time in the Marines. He was given Antabuse, and he said he stayed sober for three months thereafter. Defendant supplied exhaustive details of his drinking habits in college. Defendant said he went to the university's counseling center for his drinking, and was told to go to the Veteran's Administration facility in Danville. A doctor

there prescribed various medications, including clonazepam, oxazepam, trazadone, and paroxetine. Defendant claimed he got no counseling, just medication.

Defendant acknowledged he had been arrested for drunk driving on four occasions and he had violated a city ordinance when he was found passed out, drunk, and naked in front of his apartment building. Defendant said he could not recall some of his more egregious conduct. He stated he had been in a couple of fights he did not remember; someone told him about them afterward. He claimed he could not recall pushing Joyner to the ground. Defendant also claimed he did not remember the Keri Guillory incident. He testified he did not know if he killed Shannon McNamara, but he admitted the evidence pointed to him.

Defendant denied that he had admitted to fellow inmates that he had killed McNamara, or that he intended to make such an admission in the event he was acquitted. Defendant denied burning down the apartment building across from his residence. He said he slept with Hofer the night the fire was set. He admitted stating that he had burned down the building, but claimed he was just joking. Defendant also denied killing Amy Warner. He stated he was not drinking that night, so he could not have blacked out. He acknowledged he had been to Warner's residence three weeks before her murder. He conceded that he had told people he had killed Warner, but he attributed his comments to "a poor sense of humor."

Defendant stated that other people had access to, and used, his computer; however, he admitted that *he* had visited some of the pornographic sites recorded in his temporary files. Defendant also admitted his computer password was "Cereal Kilr," which he claimed came from a song by the band Insane Clown Posse and from columnist Dave Barry. Defendant denied that he had hidden a gun in the janitor's supply room where he worked.

Defendant testified that Marines were given shots for a variety of diseases—including malaria—prior to overseas deployments. Defendant admitted he did not know what drugs they were given.

In his testimony, defendant implied that certain books in his library might have been on the Marine Corps' suggested reading list. Defendant said he saved his Marine Corps manuals for the knowledge contained therein. He said he was not an admirer of Timothy McVeigh or David Koresh. He stated he does not support the overthrow of the government.

Under cross-examination, defendant admitted he started out in the Marines as a private, and he ended up as a private. He denied that he had visited all of the pornographic sites on his computer. He did not specify which sites he had visited. He said he did have nude pictures of former girlfriends in sexual poses. Defendant acknowledged he had *denied* anal intercourse with Randi Morris when he was interviewed by Dr. Park Dietz. Thus, he admitted he *remembered* the incident. Defendant told Dietz, "It slipped. It poked her and she freaks out and that is it. *** I did put my hand over her mouth, like, shut up man. What are you freaking out about?" When defendant was interviewed by the police after McNamara's murder, he told them he *recalled* he had gotten scratches on his hand from a broken shot glass the night of McNamara's murder. In February of 2000, during a visit to the Veterans Administration hospital, defendant reported to Dr. Kahlon that he did not have any problems with his memory. Although defendant maintained, under cross-examination, that the medications he received from the Veterans Administration hospital did not help him, he acknowledged that, during a return visit in January of 2001, he had reported he was feeling a lot better. Contrary to his trial testimony, in his interview with Dr. Boyd, defendant had reported he *rarely* experienced memory blackouts.

Under further questioning, defendant admitted he was asked, on a Marine screening questionnaire, if he had ever been sexually abused as a child or an adolescent. He indicated he had not. He conceded he did not tell anyone at the university counseling center about the alleged abuse, he did not tell anyone at the Veterans Administration, and he could not recall telling Dr. Boyd. The first person he told was Dr. Mark Cunningham, the expert retained by the defense, in an interview one month before trial.

Finally, defendant conceded he may have told a counselor at the university that he had tried to commit suicide, but would not try again; rather, he would "kill others to force the police to kill him." Defendant acknowledged he had two tattoos of the Grim Reaper and, on his back, a large tattoo of a cross with skulls around it. As a follow-up to defendant's extensive testimony regarding his religious beliefs and participation in church activities, the prosecutor asked defendant to explain what he meant when he referred to himself as an "agnostic Methodist." Dependent responded, "I can't honestly tell you." Defendant admitted that he resented organized religion and had referred to it as a scam and a crutch for the weak.

Defendant's final witness was Dr. Mark Cunningham, a clinical and forensic psychologist, who testified regarding defendant's "damaging developmental factors and experiences." Cunningham said his opinions were based upon information obtained from relatives and others who knew defendant, as well as from school records, military records, and offense records.

Cunningham first found that defendant had a genetic predisposition to alcohol dependence and mood disorder. According to Cunningham, there was a significant incidence of alcoholism and depression in defendant's family tree. He cited case studies indicating that alcohol

and drug abuse have a strong hereditary risk factor. He testified that family behavioral patterns also affect the predisposition.

Cunningham also testified regarding the concepts, effects and consequences of "sequential damage," "modeling," and "scripting." In essence, Cunningham espoused a form of behavioral determinism in which a child who is subjected to emotional deprevation is forever damaged, the child will invariably adopt the behavioral patterns of parents and perpetuate them in rearing the next generation, and the child will follow a "story line." Cunningham described "scripting" as "what is supposed to happen in your life."

Applying those principles to defendant, Cunningham testified that defendant was abandoned physically and emotionally as a child, and, as a result, his "primary attachments" were disrupted. Defendant began his life living with his mother in "a situation that can only be described as pretty much neglect." Cunningham concluded that defendant's mother had not responded to defendant in a "maternal way." Moreover, when defendant's father got custody, he did not make up for the maternal void. Cunningham stated that a good and caring mother in the first year or two of life is critical. Cunningham stated that defendant had also reported childhood sexual abuse at the hands of his stepsister and stepbrother when defendant was 10 or 11 years old. Cunningham cited studies of sexual homicides conducted by the FBI's behavioral science unit. He noted, "[A]t the core of those homicides, they found disturbed attachments to the parents or to other members of the family during the childhood of these offenders."

Cunningham opined that the influence of family environment on a child's social development lasts a lifetime, and a child who is neglected during his early years has increased risks for psychological disorders,

behavioral problems, and violent offending. Cunningham testified that the family characteristics of a sexual homicide offender include poor attachment, neglect, instability of home structure, poor relationships with parents, abandonment, physical and psychological abuse, family sex problems, and sexual abuse. Cunningham said he saw many of those factors in defendant's history. Notwithstanding those risk factors, defendant's inhibitions seemed to work well when he was sober. Cunningham believed they were insufficient when he became intoxicated, and defendant then tended to engage in aggressive behavior.

Although Cunningham had no expertise in either psychiatry or pharmacology, he testified regarding the possible side effects of the drug Lariam, providing the jury with information he got from a pharmacological flyer. Cunningham assumed Lariam had been given to defendant because it is the antimalarial drug of choice for the United States military. Cunningham testified that Lariam may cause anxiety, paranoia, psychotic behavior, headaches and sleep disorders. Cunningham also testified regarding the possible side effects of Paxil.

Cunningham conceded that most people who have risk factors and histories similar to defendant's do not commit an offense like the McNamara murder. He admitted that defendant had a choice in the matter and there was "some moral culpability." However, Cunningham considered it "a function of degree."

Cunningham also offered risk assessment testimony. He stated it is incorrect to assume that a defendant sentenced to natural life would be more violent because he has nothing to lose, or that violent offenders are more likely to be violent in prison. Cunningham testified that the security, structure, and consequences of incarceration are significant curbs. He stated that inmates have no access to highly lethal weapons and, though there is

access to drugs and alcohol, it is "much reduced compared to what somebody can maintain in the community." Cunningham said that inmates with long prison sentences have lower rates of disciplinary infractions and, as inmates get older, their rates decrease as well. Cunningham assessed defendant's risk of further serious violence at between 9.2% and 14.8%.

Under cross-examination, Cunningham acknowledged that alcohol and drugs *are* available in prison. He admitted he knew of no case in which the ingestion of Lariam had been connected to the commission of a murder. Although he conceded that most Marines get out of the service and do not commit murder, he said he believed the use of Lariam, "several years" prior to the murder, might have been "a potential contributor." He admitted he could not "draw a *** direct certain nexus" between Lariam and murder. Cunningham also suggested that Paxil "could have some contributory role." Cunningham agreed that he, as a psychologist, is not in a position to sit in judgment of a physician's decision to prescribe medication for his patient.

Cunningham acknowledged that he had reviewed the transcript of defendant's interview with Dr. Dietz. Cunningham said he had in fact relied on it as a primary source of information in drawing his own conclusions. In a series of questions, the prosecutor then asked Cunningham if he was aware of certain responses defendant had given in his interview with Dietz, and Cunningham responded affirmatively. In that interview, defendant had described his father as "kind," not "cold," "generous," not "miserly," "peaceful," not "violent," "hard working," not "lazy," a "teetotaler," not a "drunk," "law abiding," not "criminal." Defendant was asked if he respected his father, to which he replied, "Yeah." Defendant was asked if he had looked up to his father, to which he replied, "Still do." In his interview with Dietz,

defendant denied that anyone had ever abused him, physically or sexually. Defendant denied that he felt emotionally abused or neglected as a child. Defendant in fact told Dietz: "I was extremely happy as a youngster." Defendant stated he had a good childhood. Defendant admitted he had a loving grandmother who cared for him and was interested in his activities. Cunningham conceded that defendant's grandmother was a good influence on him, and that she and the church provided defendant with solid underpinnings. Cunningham admitted that most people with backgrounds similar to defendant's do not commit murder.

Although Cunningham acknowledged the answers defendant had given in his interview with Dietz, Cunningham later testified that defendant, in that interview, "seemed to be trying to protect his family and not blame them for the situation that he was in." Cunningham suggested that capital defendants typically do not report things that happened to them as they grew up. Cunningham said he was not surprised that "the truth is inconsistent with Anthony's answers on that date."

With respect to the issue of defendant's future dangerousness, Cunningham did concede that a pattern of violence while incarcerated "is far more predictive than the group statistical rate."

At the conclusion of Cunningham's testimony, the jury heard closing arguments, was given applicable instruction, and retired to consider its verdict. In just under three hours, the jury unanimously returned a verdict. That verdict read: "We, the jury, unanimously find that there is no mitigating factor sufficient to preclude the imposition of a death sentence. The court shall sentence the Defendant, Anthony B. Mertz, to death." The jury was polled and each juror affirmed that was his or her verdict. Pursuant to defendant's earlier jury waiver, the court subsequently found all three of-

fenses—first degree murder, home invasion, and aggravated criminal sexual assault—were accompanied by exceptionally brutal and heinous behavior indicative of wanton cruelty. Defendant was sentenced to death for the murder of Shannon McNamara, and to 60 years' imprisonment for home invasion.

## ANALYSIS

We begin our analysis by reaffirming certain general principles that apply to our review of capital sentencing proceedings. We do so with a full appreciation of the laudable death penalty reforms recently enacted by the legislature, reforms meant to ensure that only the guilty are convicted, and only those deserving of the ultimate penalty are so sentenced. In reiterating the following, well-established principles, we are cognizant of the responsibility we have been given to override a jury's sentencing verdict—absent *any* trial error—if we believe the imposition of a death penalty is "fundamentally unjust" in a given case. See 720 ILCS 5/9—1(i) (West 2004). Although we are prepared to exercise that authority in appropriate cases, we will not lightly disregard the decision of a jury, where a defendant has exercised his right to sentencing by a jury of his peers, and that jury has spoken.

With these precepts in mind, we note that the decision made at the second stage of a death penalty hearing is, and always has been, a process of evidentiary balancing. Compare 720 ILCS 5/9—1(g), (h) (West 2004), with *People v. Ballard*, 206 Ill. 2d 151, 188 (2002) ("A balancing process of the aggravation and mitigation evidence presented is required of the sentencing authority"), and *People v. Johnson*, 146 Ill. 2d 109, 145 (1991). As Justice Harrison wrote in *People v. Taylor*, 166 Ill. 2d 414, 432 (1995):

> "The decision made at the second stage of a death penalty hearing[,] when factors in mitigation and in aggravation

are considered[,] is a process of balancing in which evidence in aggravation is measured against that in mitigation. [Citation.] The decision of a capital sentencing jury will not be overturned lightly, particularly where that decision is amply supported by the record."

However, when requested to do so, this court reviews the evidence adduced in capital sentencing proceedings, irrespective of claims of error, to determine whether death is the appropriate penalty. As we stated in *Ballard*:

> "In determining whether a sentence of death is proper, we must consider 'the character and record of the individual offender and the circumstances of the particular offense.' *People v. Pitsonbarger*, 142 Ill. 2d 353, 388 (1990), citing *Woodson v. North Carolina*, 428 U.S. 280, 304, 49 L. Ed. 2d 944, 961, 96 S. Ct. 2978, 2991 (1976). '[E]ach capital case is unique and must be evaluated on its own facts, focusing on whether the circumstances of the crime and the character of the defendant are such that the deterrent and retributive functions of the ultimate sanction will be served by imposing the death penalty.' *People v. Johnson*, 128 Ill. 2d 253, 280 (1989). 'A death sentence is appropriate if the sentence is commensurate with the seriousness of the offenses and gives adequate consideration to relevant mitigating circumstances.' *Pitsonbarger*, 142 Ill. 2d at 388." *Ballard*, 206 Ill. 2d at 179.

Once a jury finds a defendant eligible for the death penalty, the jury is free to consider a myriad of factors to determine whether death is the appropriate punishment. *Simmons v. South Carolina*, 512 U.S. 154, 163, 129 L. Ed. 2d 133, 142, 114 S. Ct. 2187, 2193 (1994); *California v. Ramos*, 463 U.S. 992, 1008, 77 L. Ed. 2d 1171, 1185, 103 S. Ct. 3446, 3457 (1983). A defendant's character, prior criminal history, mental capacity, background, age, and future dangerousness are just a few of the factors that a jury may consider in fixing the appropriate punishment. *Simmons*, 512 U.S. at 163, 129 L. Ed. 2d at 142, 114 S. Ct. at 2193-94. "Both a backward-looking and a forward-looking inquiry are a permissible part of the sentencing process ***." *Tuilaepa v. California*, 512 U.S.

967, 977, 129 L. Ed. 2d 750, 762, 114 S. Ct. 2630, 2637 (1994). In *Simmons*, the Supreme Court noted, "This Court has approved the jury's consideration of future dangerousness during the penalty phase of a capital trial, recognizing that a defendant's future dangerousness bears on all sentencing determinations made in our criminal justice system." *Simmons*, 512 U.S. at 162, 129 L. Ed. 2d at 141-42, 114 S. Ct. at 2193. The fact that a defendant is parole-ineligible does not prevent the State from arguing that the defendant poses a future danger, as the State may reasonably argue that defendant will pose a danger to others in prison and that executing him is the only means of eliminating the threat to the safety of other inmates or prison staff. *Simmons*, 512 U.S. at 165 n.5, 129 L. Ed. 2d at 143 n.5, 114 S. Ct. at 2194 n.5.

In assessing the weight of the evidence, and the effect of any error in sentencing proceedings, the doctrine of harmless error applies in appropriate cases. *Ballard*, 206 Ill. 2d at 194; *People v. Williams*, 193 Ill. 2d 306, 369-71 (2000); *People v. Hall*, 195 Ill. 2d 1, 19 (2000).

### I. Admission of Evidence Pertaining to Uncharged Offenses

We first consider defendant's argument that "the aggravation as to both the Warner murder and the suspected arson raise a significant risk the jury imposed the death penalty based on a crime, or crimes, defendant didn't commit." Defendant notes that he was never prosecuted for those crimes. He suggests "the standard of reliability for admission of an uncharged crime should be at least a preponderance of the evidence."

As this court noted in *People v. Caffey*, 205 Ill. 2d 52, 125 (2001), the ordinary rules of evidence are relaxed at the second stage of a capital sentencing hearing so that the sentencer may "possess the fullest information possible with respect to the defendant's life, character, criminal record, and the circumstances of the particular

offense." Section 9—1(e) of the Criminal Code of 1961 (720 ILCS 5/9—1(e) (West 2000)) provides: "Any information relevant to any additional aggravating factors or any mitigating factors indicated in subsection (c) may be presented by the State or defendant regardless of its admissibility under the rules governing the admission of evidence at criminal trials. The State and the defendant shall be given fair opportunity to rebut any information received at the hearing." It is the opportunity to test and rebut that is critical to an assessment of reliability, as was indicated by the Supreme Court in *Crawford v. Washington*, 541 U.S. 36, 61, 63, 158 L. Ed. 2d 177, 199, 200, 124 S. Ct. 1354, 1370, 1371 (2004) (the confrontation clause "commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination." "Reliability [itself] is an amorphous, if not entirely subjective, concept").

Our precedents establish that the only requirement for the admissibility of evidence at this stage of a capital sentencing hearing is that the evidence be relevant and reliable (*Caffey*, 205 Ill. 2d at 125), and it matters not that the crime in question was never prosecuted. *People v. Simms*, 168 Ill. 2d 176, 192 (1995). The determination as to relevance and reliability rests within the sound discretion of the trial court. *Caffey*, 205 Ill. 2d at 125. The trial court—which did a commendable job during the course of defendant's trial—did not abuse its discretion in allowing evidence relating to the Warner murder and the burning of the apartment building across the street from defendant's residence.

It is, to say the least, unusual for a defendant to tell his friends he committed two heinous crimes, and later acknowledge his own statements, but argue they are unreliable, the result of a "poor sense of humor." Although we are aware of no similar situation in our

case precedent, our decision in *People v. Kidd*, 175 Ill. 2d 1, 29 (1996), is instructive.

In *Kidd*, the defendant argued that the trial judge had erred in allowing the State to introduce as evidence—during the guilt/innocence phase of his trial—his testimony from LeRoy Orange's trial on the same charges, and his testimony from his own previous sentencing hearing. The defendant contended that both excerpts of his earlier testimony required exclusion because the evidence was false. Defendant submitted that admission of the statements violated the rule forbidding the prosecution from knowingly presenting perjured testimony. In support of that theory, defendant noted, when he had testified at Orange's trial, the prosecution had impeached him with statements he made to the police following his arrest. The defendant suggested that the State had thus conceded the falsity of statements made in the course of his prior testimony, in which he had admitted his involvement in the charged offenses. See *Kidd*, 175 Ill. 2d at 28-29.

This court rejected defendant's argument, stating:

"The statements at issue were all made by the defendant and, so long as they were relevant to the case, could be introduced against him as admissions of a party opponent. [Citations.] If the defendant has given various accounts of his activities on the night of the offenses, then, as the trial judge noted in refusing to exclude the prior testimony, 'that's his problem, and he has to live with it.' We do not believe that the State must now be disabled from presenting the defendant's earlier inculpatory statements simply because there are discrepancies in what the defendant has said at different times on different occasions." *Kidd*, 175 Ill. 2d at 29.

Like the defendant in *Kidd*, the defendant in this case clearly made the statements in question, stating that he had murdered Warner and had burned down the apartment building. He acknowledges that he made the statements. However, he now suggests that the state-

ments are untrue and attributes his unsolicited statements to "a poor sense of humor." There is no suggestion in the record that defendant was delusional when he made the statements, or that he was prompted or goaded into making them.

As *Kidd* suggests, evidence is not necessarily unreliable simply because defendant chooses to present testimony controverting it, or attempts to explain away the statement by reference to the context in which it is made. We believe it is highly unlikely that anyone would make such comments in jest, and, given the totality of the evidence before the jury, it was certainly reasonable for the jury to doubt defendant's explanation. The statements are relevant, and they are reliable in the sense that there is no question that they were made, and made voluntarily and without prompting. Beyond that, defendant's motive for making them was a matter for the jury.

Moreover, with respect to the Warner murder, there was substantial evidence to corroborate defendant's admissions that he had killed Warner. For instance, when defendant told his friend, Douglas Paul, that he had killed Warner, defendant referred to Warner as "white trash," the very same term he had used to refer to Darsann Barker after he sexually assaulted her. The use of that disparaging epithet suggests a malice inconsistent with intended "humor." Moreover, the jury not only heard testimony from defendant's friends about his admissions, but also learned that defendant had been in Warner's residence only two or three weeks prior to the murder, and he had kept an article about Warner's murder pinned up on his wall, indicating that the murder held some special significance for him. In his testimony, defendant denied that he even knew Warner. There were also obvious similarities between the McNamara murder—which defendant does not dispute he committed—and the Warner murder. There were sexual components

to both murders, both victims had large incise wounds to their necks, and both victims were found "posed" in a nearly identical fashion, with their arms outstretched above their heads, as crime scene photos clearly indicate. Finally, Warner's neck was the primary point of attack—her throat having been slashed—and the same was true in defendant's known attacks on other women: manual strangulation was one of the causes of McNamara's death; defendant forcefully twisted the neck of Randi Morris during his sexual assault of her; and defendant even choked his own girlfriend, Tara Hofer, during one of many episodes of violence. Thus, there was substantial evidence corroborating defendant's statements that he committed the Warner murder.

In our opinion, there is no question about the reliability and admissibility of defendant's statements implicating himself in the Warner murder and the arson. While there was substantial corroboration of defendant's statements admitting the murder of Amy Warner, we hold defendant's unsolicited and acknowledged admissions to his friends, were admissible, standing alone, even without corroboration. Again, the ordinary rules of evidence are relaxed at the second stage of a capital sentencing hearing. *Caffey*, 205 Ill. 2d at 125. The statements at issue were voluntary. They were not made to police officers in a custodial setting or to jailhouse informants. They were made to defendant's friends, with no prompting whatsoever. Defendant's friends testified that he made the statements, and he acknowledges he made them. It was for the jury to ultimately decide whether the statements were the product of a "poor sense of humor," as defendant suggested, or genuine admissions of responsibility. In either case, the statements qualify for second-stage admission under the standards of relevance and reliability. See generally *People v. Milka*, 211 Ill. 2d 150, 180 (2004) (where

defendant unquestionably made the statements at issue, the circumstances under which defendant's statements were made, and his motive in making them, were held to be matters for the jury to consider, rather than issues of reliability).

## II. First and Second Amendment Issues

We turn now to defendant's contention that the admission of certain other types of evidence violated his rights under the first and second amendments of the United States Constitution, as well as similar provisions of the Illinois Constitution, and violated his right to a fair sentencing hearing, in that the evidence was irrelevant or unreliable. Specifically, defendant asserts that his rights were violated when the State introduced evidence of his Internet viewing of sexually explicit sites, nude photos of his girlfriends, his e-mail address, his tattoos, the books he possessed, his possession of guns, and his "political" statements.

In support of his argument, defendant relies primarily upon the Supreme Court's opinion in *Dawson v. Delaware*, 503 U.S. 159, 117 L. Ed. 2d 309, 112 S. Ct. 1093 (1992). We believe defendant reads *Dawson* much too broadly.

The defendant in *Dawson* was a member of a prison gang called the "Aryan Brotherhood." During the penalty phase of Dawson's trial, the following stipulation was entered into evidence. " 'The Aryan Brotherhood refers to a white racist prison gang that began in the 1960's in California in response to other gangs of racial minorities. Separate gangs calling themselves the Aryan Brotherhood now exist in many state prisons including Delaware.' " *Dawson*, 503 U.S. at 162, 117 L. Ed. 2d at 315, 112 S. Ct. at 1096. The defendant in *Dawson* later claimed the stipulation violated his constitutional rights. Dawson cited the Supreme Court's decision in *Zant v. Stephens*, 462 U.S. 862, 77 L. Ed. 2d 235, 103 S. Ct. 2733

(1983), wherein the Court had held that an aggravating circumstance is invalid if "it authorizes a jury to draw adverse inferences from conduct that is constitutionally protected." *Zant*, 462 U.S. at 885, 77 L. Ed. 2d at 255, 103 S. Ct. at 2747. Relying upon *Zant*, Dawson argued that "the Constitution forbids the consideration in sentencing of any evidence concerning beliefs or activities that are protected under the First Amendment." *Dawson*, 503 U.S. at 164, 117 L. Ed. 2d at 316, 112 S. Ct. at 1097.

The Supreme Court rejected such a broad reading of *Zant*, stating, "the Constitution does not erect a *per se* barrier to the admission of evidence concerning one's beliefs and associations at sentencing simply because those beliefs and associations are protected by the First Amendment." *Dawson*, 503 U.S. at 165, 117 L. Ed. 2d at 317, 112 S. Ct. at 1097. The Court, nonetheless, held that the stipulation violated defendant's constitutional rights, and explained why:

> "Before the penalty hearing, the prosecution claimed that its expert witness would show that the Aryan Brotherhood is a white racist prison gang that is associated with drugs and violent escape attempts at prisons, and that advocates the murder of fellow inmates. If credible and otherwise admissible evidence to that effect had been presented, we would have a much different case. But, after reaching an agreement with Dawson, the prosecution limited its proof regarding the Aryan Brotherhood to the stipulation. The brief stipulation proved only that an Aryan Brotherhood prison gang originated in California in the 1960's, that it entertains white racist beliefs, and that a separate gang in the Delaware prison system calls itself the Aryan Brotherhood. We conclude that the narrowness of the stipulation left the Aryan Brotherhood evidence totally without relevance to Dawson's sentencing proceeding." *Dawson*, 503 U.S. at 165, 117 L. Ed. 2d at 317, 112 S. Ct. at 1097.

The Court's concluding comments provide guidance as to the kind of evidence that would be admissible:

"Because the prosecution did not prove that the Aryan Brotherhood had committed any unlawful or violent acts, or had even endorsed such acts, the Aryan Brotherhood evidence was also not relevant to help prove any aggravating circumstance. In many cases, for example, associational evidence might serve a legitimate purpose in showing that a defendant represents a future danger to society. A defendant's membership in an organization that endorses the killing of any identifiable group, for example, might be relevant to a jury's inquiry into whether the defendant will be dangerous in the future. Other evidence concerning a defendant's associations might be relevant in proving other aggravating circumstances. But the inference which the jury was invited to draw in this case tended to prove nothing more than the abstract beliefs of the Delaware chapter." *Dawson*, 503 U.S. at 166, 117 L. Ed. 2d at 318, 112 S. Ct. at 1098.

We find that most, if not all, of the evidence at issue in this case is admissible under the principles enunciated in *Dawson*. To the extent that some of this evidence may have been improperly admitted, its admission was harmless beyond a reasonable doubt in view of overwhelming aggravating evidence.

We first find that all evidence of a sexual nature was properly admitted, including Internet images of women engaging in sexual acts with a dog and a horse, women in sexually explicit positions, nude children, sexually explicit cartoons, and the articles on date rape. Although the defense presented testimony that other people had access to defendant's computer, and that Tara Hofer was responsible for the date rape articles, defendant admitted that he *had* visited some pornographic sites, without specifying which ones. The images and the articles were found on *defendant's* computer. They were properly admitted, as were the nude photos of defendant's girlfriends. The plausibility of the defense testimony was for the jury to decide, considering it in conjunction with other evidence of defendant's sexual conduct. The relevance of this evidence is obvious.

Evidence of defendant's obsession with sex was properly admitted because both the McNamara and Warner murders had sexual components, there was evidence that defendant had used violence or force in other sexual encounters, and defendant had, in other ways, demeaned and denigrated some of the women with whom he had had relationships. Thus, evidence of this nature bore upon the issue of defendant's future dangerousness. We note that similar evidence was held to have been properly admitted in *Boyle v. Johnson*, 93 F.3d 180, 184-85 (5th Cir. 1996). As the court of appeals stated in *Boyle*:

"Here the state put on evidence that Boyle was obsessed with sex, and that his sexual expression had a violent component. Unlike the situation in *Dawson*, where there was no connection between the evidence presented and the crime committed, Boyle was convicted for a murder which had a sexual component. *** Evidence of Boyle's sexual obsession was thus relevant to the issue of Boyle's future dangerousness ***." *Boyle*, 93 F.3d at 184-85.

In this case, defendant's sexual obsession, and its relevance to his future dangerousness, is amply demonstrated by his lewd and morbid sexual overture to a female correctional officer while awaiting trial for Shannon McNamara's murder, a comment suggesting that he would have sex with the officer's dead body. That statement underscores the relevance and extent of defendant's sexual obsession, and shows that defendant is incorrigible and remains a danger to society whether he is drunk or sober, incarcerated or not. We conclude that all evidence bearing upon defendant's sexual obsession was relevant aggravating evidence and was properly admitted.

Similarly, we find no error in the admission of evidence regarding defendant's tattoos and his e-mail address, "Cereal Kilr 2000." As previously mentioned, defendant had two tattoos of the Grim Reaper and another of a cross surrounded by skulls. In light of the

overwhelming evidence that defendant brutally murdered Shannon McNamara in June of 2001, the substantial evidence that he had done the same to Amy Warner in June of 1999, the graphic testimony of Randi Morris, which suggested that she too might have met her end at defendant's hands, but for her plea to defendant to spare her life, defendant's statement to her that the Marines had taught him to kill without remorse, and his statement to a university counselor that he would kill others to force the police to kill him, we believe the challenged evidence provides additional, inferential insight into the defendant's state of mind, then, and now. Defendant's state of mind during the commission of the charged offenses is a relevant consideration in capital sentencing. See *People v. Williams*, 181 Ill. 2d 297, 334 (1998); *People v. Turner*, 156 Ill. 2d 354, 367 (1993). Defendant might well consider himself a "serial killer," or the "Grim Reaper," remorselessly snuffing out life when and where he chooses. The tattoos and e-mail address were thus relevant and sufficiently related to defendant's conduct to pass muster under *Dawson*. It was for the jury to decide whether these were other manifestations of defendant's "poor sense of humor"—like his "joking" statements that he killed Warner, and his "joking" statement that he had burned down an apartment building—or windows into the mind of a serial killer, who was fixated upon violence, death and killing, and who thus represents a continuing threat to those around him.

Even assuming, *arguendo*, the admission of brief testimony regarding defendant's tattoos and e-mail address was error, we find it was harmless beyond a reasonable doubt in light of the overwhelming aggravating evidence presented in this case. See *People v. Shatner*, 174 Ill. 2d 133, 156 (1996) (holding that the erroneous introduction of such evidence is subject to harmless error analysis). Given the extensive evidence of defendant's

sexual obsession, violent acts and threatening behavior, the notion that the exclusion of *this* evidence would have made a difference in the jury's verdict is simply not plausible.

We next consider defendant's contention that the trial court erred in allowing testimony regarding the books he possessed. The State presented testimony that defendant had books entitled Pipe and Fire Bomb Designs, The Anarchist's Cookbook, SS: Blood Soaked Soil, Hitler's Enforcers, Mein Kampf, as well as Marine Corps training manuals. Defendant argues that the books on "Hitler, Nazism, anarchism, and Marine training were irrelevant aggravation protected by the First Amendment." We disagree.

In *Dawson*, the Supreme Court made clear that, had the State presented "credible and otherwise admissible evidence" that the Aryan Brotherhood was "associated with drugs and violent escape attempts at prisons," and advocated "the murder of fellow inmates," the Court would have been confronted with a "much different case." *Dawson*, 503 U.S. at 165, 117 L. Ed. 2d at 317, 112 S. Ct. at 1097. The Court also provided guidelines for admission of evidence that would otherwise be subject to first amendment protection. The court suggested that evidence of defendant's membership in the gang might have been proper had the State proven that the Aryan Brotherhood "had committed any unlawful or violent acts, or had even endorsed such acts." *Dawson*, 503 U.S. at 166, 117 L. Ed. 2d at 318, 112 S. Ct. at 1098. The Court noted: "A defendant's membership in an organization that endorses the killing of any identifiable group, for example, might be relevant to a jury's inquiry into whether the defendant will be dangerous in the future." *Dawson*, 503 U.S. at 166, 117 L. Ed. 2d at 318, 112 S. Ct. at 1098.

Given the facts of this case, the exclusionary prin-

ciples of *Dawson* do not apply. We have a "much different case" here. Defendant admitted to friends that he had burned down an apartment building. He effectively endorsed Hitler's extermination of millions of human beings when he told Randi Morris he respected Hitler for trying to "purify his race." On one occasion, defendant shouted a racial epithet at an African-American and provoked a physical confrontation. As previously mentioned, he told Morris the Marines taught him to kill without remorse. The description of defendant's actions in his assaults on women—routinely trying to cut off the victim's air supply or attack the victim's neck—suggests maneuvers learned in military training. In light of this evidence, we believe testimony regarding these books was properly admitted. The defendant's possession of Pipe and Fire Bomb Designs and The Anarchist's Cookbook is sufficiently related to defendant's act of arson to support admission. Defendant's possession of copies of SS: Blood Soaked Soil, Hitler's Enforcers, and Mein Kampf was a proper subject of testimony given defendant's endorsement of genocide, his readiness to hurl provocative racial epithets, and persistent aggressive and violent behavior. Indeed, in light of defendant's aggressive and violent actions, it would be absurd to prohibit a sentencing jury from considering how such beliefs might impact defendant's future dangerousness in a mixed racial prison population. Finally, although we consider defendant's possession of the Marine Corps training manuals of only marginal relevance, we nonetheless believe they *were* relevant and admissible given defendant's assertion that he had been trained in the Marines to be a remorseless killer, and the techniques he employed in assaulting women.

Defendant notes that he and others testified that he wanted to be a history teacher and implied that the books might have been on a suggested reading list for the

Marines as well. Defendant points to such evidence in arguing that the State's evidence lacked relevancy. In this respect, defendant makes the same analytical error he makes in his previous arguments. Simply because defendant can offer an alternative explanation for certain evidence does not mean that evidence is automatically rendered unreliable. If that were so, the trier of fact would have no function. We hold no error occurred in this respect.

Moreover, we find no reversible error in superfluous evidence of defendant's possession of a nine-millimeter handgun and a shotgun. In defendant's original brief, defense counsel concedes that "testimony defendant hid a .22-caliber gun at his work may have been aggravating as to that weapon," but submits "defendant's ownership of a nine millimeter Baretta handgun and a shotgun were legal and irrelevant for purposes of aggravation." In his reply brief, defendant continues with this argument:

"The State lumps together defendant's illegal possession of guns with his legal possession of guns. The State argues that a condition of defendant's probation was no possession of guns after 2001. The flaw in this is the absence of evidence as to when he bought one of the guns. Supplementing illegal possession of guns with legal possession of guns serves only to exaggerate and unfairly prejudice when none of defendant's alleged crimes involved a gun."

The point of the State's evidence was that possession of the guns in 2001 constituted a violation of the terms of defendant's probation, a point of which the jury was well aware. Although defendant denied that he had hidden a .22-caliber gun at his place of employment, the State's evidence was sufficient to prove that he did. After the McNamara murder, but prior to his arrest, defendant was observed standing on a sink in a closet, "doing something up high." The .22-caliber gun was later recovered from that location. Although the State's evidence was somewhat vague as to whether defendant

possessed the other weapons within the period of probation, we are confident that evidence was not a factor in the jury's verdict. The evidence was cumulative and did not unfairly prejudice defendant.

Finally, we tend to agree with defendant that testimony regarding defendant's alleged sympathies for Timothy McVeigh, and other antigovernment factions, and his opposition to the death penalty was irrelevant and improperly admitted. In our view, those beliefs were not sufficiently related to relevant considerations in this case. Notwithstanding, the admission of this evidence, which proportionally occupies a minuscule part of the trial transcript, was harmless beyond a reasonable doubt in light of the overwhelming aggravating evidence against defendant.

### III. "Profiler" Testimony

Defendant next contends that the testimony of James Wright, which the State used to "link defendant to other crimes, was irrelevant and unreliable." Defendant's specific concern is that Wright's testimony prejudiced defendant by "linking" him to the Warner murder and the burning of the apartment building. Defendant submits, generally, that "profiler" testimony has not been shown to be reliable, it in effect entails a "subjective" comparison of crimes, and, in this case, the profiler lacked the psychiatric and psychological expertise to render certain opinions as to the state of mind of the person who committed the offenses.

The record indicates that the State tendered Wright as "an expert in the area of criminal investigation, particularly with regard to crime scenes." Under preliminary cross-examination by defense counsel, however, it became clear that Wright had been asked to render opinions that are commonly and popularly associated with the practice of "profiling." He had been asked to compare the McNamara murder, the Warner murder, and

the arson, and say "whatever [he] could about the individual that committed the three crimes or if they could possibly be connected." In that respect, Wright was asked to use the profile derived from the police investigation and engage in the process known as "profile-crime correspondence (P-CC), in which the profiler provides evidence to assert whether two or more crimes are likely (or not likely) to have been committed by the same offender." See L. Alison, A. West & A. Goodwill, *Pragmatists' Views of Offender Profiling*, 10 Psychol. Pub. Pol'y & L. 71, 79 (March-June 2004). Wright said he was also asked to evaluate the crimes, evaluate the defendant, and render an opinion as to whether defendant was responsible. In that regard, Wright was asked to engage in the process known as profile-defendant correspondence (P-DC), in which the profiler, using the criteria set out in the crime profile, adduces evidence as to defendant's guilt or innocence. 10 Psychol. Pub. Pol'y & L. at 79. "P-DC is more controversial than P-CC, because of prejudice (the former necessitates direct commentary about the defendant, whereas the latter considers the similarity between offenses.)" 10 Psychol. Pub. Pol'y & L. at 79. In any event, at the close of defense counsel's preliminary questioning, counsel objected to Wright's being qualified to testify as an expert. The trial court overruled the objection, and Wright proceeded to testify.

Based upon his review of relevant source materials, Wright compared the McNamara murder, the Warner murder, and the suspected arson of the apartment building in terms of the offender's organization, preplanning, anger, control, and sense of power. He did *not*, however, testify that defendant committed the Warner murder or burned down the apartment building.

Wright noted that the McNamara crime scene revealed elements of organization and planning initially, but the crime became disorganized because of unexpected

resistance, resulting in certain evidentiary items being left behind, *i.e.*, defendant's credit card, a box cutter, and a torn piece of a latex glove. He noted evidence that defendant had been watching the apartment prior to the murder, indicating a degree of planning. Wright offered his opinion that the severe and mutilating injuries to McNamara's body indicated excessive, intense anger on the part of the perpetrator, caused by the victim's resistance and defendant's loss of control.

Wright found the Warner murder much more organized and noted minimal resistance on the part of the victim, a fact he attributed to the element of surprise and the perpetrator's employment of overwhelming force or intimidation. He said the two biggest similarities in the murders were attacks to the throat and the way the perpetrator had displayed the victims' bodies: naked from the waist down; arms outstretched above their heads. Wright observed that both victims had knife wounds to their necks. Wright said in defendant's previous, violent encounters with women, the neck was normally the point of attack.

As for the suspected arson, Wright noted that studies indicate arsonists experience a "sense of power and control" in setting a fire, particularly a large fire. Wright observed, in reports of defendant's interaction with police, he was commonly uncooperative, belligerent and combative. Wright stated that defendant's history of activities with law enforcement officers demonstrated a lack of respect for authority. Wright also commented on the newspaper article on the Warner murder that defendant had posted in his apartment. He then stated that serial killers and serial rapists tend to keep articles about the crimes they commit. Wright testified, over objection, that defendant's history showed a lot of anger toward women. He stated that the mutilation of McNamara's body was an expression of anger. Wright

conceded that there were differences in the three crimes and that reports he had reviewed indicated the cause of the apartment building fire could not be determined. As noted, in his testimony, Wright never explicitly rendered an opinion as to whether defendant committed the other two offenses.

Initially, we note that this court has held that an individual will be permitted to testify as an expert if that person's experience and qualifications afford him or her knowledge that is not common to laypersons, and where such testimony will aid the fact finder in reaching its conclusion. *People v. Novak*, 163 Ill. 2d 93, 104 (1994); *People v. Jordan*, 103 Ill. 2d 192, 208 (1984). As this court stated in *Novak*:

> "The indicia of expertise is not an assigned level of academic qualifications. Rather, the test is whether the expert has knowledge and experience beyond the average citizen that would assist the jury in evaluating the evidence. [Citation.] The expert may gain his or her knowledge through practical experience rather than scientific study, training, or research. There is no precise requirement as to how the expert acquires skill or experience. [Citation.] Regardless of how specialized knowledge is acquired, whether through education, training, experience, or a combination of each, if the witness possesses such knowledge, he or she may testify as an expert." *Novak*, 163 Ill. 2d at 104.

An expert's testimony will assist the jury when his or her testimony offers knowledge and application of principles beyond the ken of the average juror. *Compton v. Ubilluz*, 353 Ill. App. 3d 863, 867 (2004). Evidence is beyond the ken of the average juror when the evidence involves knowledge or experience that a juror generally lacks. *Compton*, 353 Ill. App. 3d at 867.

The question of admissibility of profiler testimony in criminal cases has been a matter of some controversy; however, recent decisions by state supreme courts seem to come down on the side of exclusion, at least where the

evaluative testimony of the profiler is not supported by evidence of reliable databases and methodologies. See *State v. Fortin*, 178 N.J. 540, 587-90, 843 A.2d 974, 1000-02 (2004) (finding reversible error where a retired FBI profiler was permitted to testify on violent sexual crimes without producing a reliable database of violent sexual assault cases he had investigated, studied and analyzed); *State v. Stevens*, 78 S.W.3d 817, 836 (Tenn. 2002) (rejecting an ex-FBI profiler's testimony because of insufficient evidence of methodology and inadequate indicia of reliability). Indeed, there appears to be an implicit recognition in some professional circles that the development of supporting databases of systematic and rigorous case studies will be necessary in order to "enhance the credibility of profiling as a discipline in the legal profession and enhance the prospects of profiles being admissible as evidence." 10 Psychol. Pub. Pol'y & L. at 80. Several years ago, the FBI itself conceded that there had been few systematic efforts to validate its profile-derived classifications. 10 Psychol. Pub. Pol'y & L. at 73. Although it has been acknowledged that the coding of information for such a database is "not a straightforward process," those practicing in the field obviously believe it can be done. See D. Canter, L. Alison, E. Alison & N. Wentink, *The Organized/Disorganized Typology of Serial Murder, Myth or Model?*, 10 Psychol. Pub. Pol'y & L. 293, 303-04 (September 2004).

It would be helpful to see supporting statistics when profiling testimony is proffered in future cases. In this case, however, we need not decide whether its absence renders Wright's testimony inadmissible. We need not determine whether Wright's "profiler" testimony was properly before the jury because any error in its admission was harmless beyond a reasonable doubt. See *People v. Hart*, 214 Ill. 2d 490, 517 (2005) (unnecessary to address merits of argument where error, if any, is harm-

less); *People v. Morgan*, 197 Ill. 2d 404, 442 (2001) (same); *People v. Hooper*, 172 Ill. 2d 64, 79-80 (1996) (same). The testimony of Wright was, for the most part, cumulative of testimony given by other witnesses, and any inferences drawn by Wright were commonsense ones that the jurors no doubt had already drawn for themselves.

For example, both Joe Siefferman and Patrick Callaghan also testified to readily observable similarities between the McNamara and Warner murders. Siefferman, for instance, testified that both victims appear to have been posed. He noted, in each instance, photographs reveal a victim lying on her back with her arms extended above her head. In each instance, the victim was naked from the waist down. Both were apparently attacked in their sleep. Both victims sustained injuries from sharp objects. In neither instance were identifiable fingerprints found. Richard Caudell also testified that defendant had posed or displayed McNamara's body. Patrick Callaghan testified that he started looking for connections between defendant and Amy Warner after *he* noted the similarities between the two murders. He then learned that Douglas Paul had indicated that defendant had *admitted* murdering Warner. Indeed, two people—not counting defendant—eventually testified that defendant had said he killed Warner; four people eventually testified that defendant had admitted burning down the building across the street from his apartment. We note that voluntary statements by a defendant are generally believed to have a "high degree of reliability." See *James v. Illinois*, 493 U.S. 307, 327, 107 L. Ed. 2d 676, 693, 110 S. Ct. 648, 659 (1990) (Kennedy, J., dissenting, joined by Rehnquist, C.J., O'Connor and Scalia, JJ.). We have already discussed the evidence corroborating the Warner admission. Given this evidence, Wright's testimony was, in our opinion, cumulative and essentially superfluous on the issue of the defendant's commission of the Warner

murder and the arson. Other evidence sufficiently linked defendant to those offenses.

As far as Wright's "psychiatric or psychological" pronouncements are concerned, we view them—with no disrespect intended—as observations that anyone off the street would have made when presented with the same evidence. Defendant complains that Wright was allowed to testify that defendant had "a lot of anger toward women," and that the mutilation of McNamara's body was an expression of anger. In light of the extensive evidence the jurors heard about defendant's aggressive and disrespectful behavior toward women, and his vicious attacks on multiple women, the jurors could readily ascertain that defendant had "a lot of anger toward women" without Wright's testimony. Moreover, the jurors undoubtedly divined that a killer who takes the time to mutilate his victim's body is angry or frustrated. They did not need Wright to tell them that.

Further, we believe the jurors also understood, without any enlightenment from Wright, that the need for power and control was an integral feature of defendant's personality. As the evidence indicates, in defendant's encounters with women, he became angry, and often violent, if they did not respond to his advances or submit to his will. When the basketball coach's daughter did not respond to defendant, he said he "ought to slap the tan off her face." When Amy Joyner did not respond to defendant's flirting, and she tried to leave his apartment, defendant pushed her to the floor twice before her companion intervened. When Randi Morris did not willingly submit to anal penetration, defendant became angry and, in her words, tried to "break my neck." Thereafter, defendant would not allow her to leave his apartment, and he attempted to control her every movement, to the extent of forcing her to accompany him to the bathroom. The evidence adduced as to the McNamara

and Warner murders suggests that both were intended victims of sexual assault and some degree of resistance culminated in the vicious murder of the victim. Even when incarcerated, awaiting trial on these charges, defendant had to exert control to the extent possible in the setting of the county jail. Defendant's refusal to allow jailers to house another inmate in his cell is just one example. This is just *some* of the evidence evincing defendant's need for control and power. We believe that characteristic of defendant's personality was obvious to the jury; it was firmly established through incidents related by other witnesses.

Defendant also complains about Wright's reference to studies conducted by the Behavioral Science Unit of the FBI, as well as other studies he had read, indicating that arsonists experience a "sense of power and control in setting a fire." Obviously, that comment might apply to some arsonists, but not others. For example, an arsonist who burns down a building to collect insurance proceeds does not do so for the sense of power or control; he burns the building for the money. It seems that anger might also be a possible motive. Wright's testimony related one factor that might motivate an arsonist to burn a building, but there are obviously others as well. In this respect, the State's attempt to link defendant to the arson is rather weak. We believe defendant's four statements admitting he had set the fire provided far more compelling linkage at trial. We find this testimony harmless beyond a reasonable doubt.

Moreover, it seems to us that defendant is in an awkward position challenging Wright's specific reference to studies of the Behavioral Science Unit when his own expert, Mark Cunningham, relied upon that unit's studies in his *own* testimony. Cunningham testified that the Behavioral Science Unit had investigated approximately 31 sexual homicides and "at the core of those homicides,

they found disturbed attachments to the parents or to other members of the family during the childhood of these offenders." Defendant apparently takes the position that conclusions of the Behavioral Science Unit were reliable enough to support the testimony of his expert, but when Wright tried to use conclusions drawn by the same unit, the findings are inadequate.

We next address defendant's contention that it was error for Wright to testify that serial killers and serial rapists tend to keep articles about the crimes they commit. We hold that this testimony was also harmless in light of other evidence adduced at trial. As we have indicated, we believe there was substantial evidence linking defendant to the Warner murder. One piece of that evidence was defendant's posting of an article about the Warner murder on the wall near his computer. Although defendant now suggests the article may have been posted there because of defendant's "interest in local crime," there was no evidence that other articles about "local crime" were similarly posted. The article about Warner's murder obviously had some special significance to defendant, such that he wanted to see it whenever he was at his computer, the same computer that bore the e-mail address "Cereal Kilr 2000." We find the jury's verdict would have been the same irrespective of Wright's testimony.

The jurors did not need Wright to draw obvious conclusions for them; yet, for the most part, that is what he did in his testimony. In sum, we hold the admission of Wright's testimony was harmless beyond a reasonable doubt in that the testimony was cumulative of testimony given by other witnesses, and any inferences drawn by Wright were commonsense ones that the jurors would have already drawn for themselves.

## IV. Testimony of Jailhouse Informants

Defendant next contends the use of "unreliable

jailhouse informants" in aggravation denied him a fair sentencing hearing. Two jail inmate informants testified for the prosecution at trial and one of them testified again during the second phase of sentencing. A third jail inmate testified for the defense, stating that the two prosecution witnesses had fabricated defendant's alleged incriminating statements. Prosecution witness Mark Stabler testified, at the guilt/innocence phase of the trial, that defendant admitted struggling with and choking the victim after Stabler and defendant had seen a television news story about the murder. Stabler denied having an agreement with the State for leniency, but said he had received immunity for assisting an investigation in another case. Michael Jordan testified, at the guilt/ innocence phase of the trial, that defendant had given him a rather detailed description of the murder, which coincided with the police theory of how the crime had been committed. At the second stage of sentencing proceedings, Jordan testified that defendant had threatened Stabler and a journalist, as well as spoken of an escape attempt if convicted. Jordan also denied any agreement with the prosecution for his testimony. The third inmate, Clifford Baugh, testified that Stabler and Jordan had fabricated their testimony from news accounts in the hopes of obtaining leniency in their own cases.

Defendant argues that Stabler's and Jordan's testimony, at the guilt/innocence phase of the trial, "particularly Jordan's recounting of defendant's alleged description of the crime which, although the likely fabricated product of information obtained from the news and law enforcement authorities, gave the prosecutors and jurors the most detailed and inflammatory account of the murder." Defendant also submits that Jordan's testimony at the death penalty hearing "further prejudiced defendant as the only evidence defendant threatened a journal-

ist and an escape attempt." Defendant characterizes Stabler's and Jordan's testimony as unreliable based solely upon the testimony of another jail inmate, Baugh. Defendant refers to the "well-known general unreliability of prison informants."

We fail to discern any basis for concluding that these prosecution witnesses were so unreliable that their testimony should have been excluded. The fact that Baugh, another jail inmate, testified that they had fabricated their testimony does not, alone, warrant exclusion. Cross-examination is the best way to ensure reliability (*Crawford*, 541 U.S. at 61, 158 L. Ed. 2d at 199, 124 S. Ct. at 1371), and defendant was afforded that right. No testimony was developed that either witness received or was promised favorable treatment in exchange for testimony in this case. No other evidence rendered their testimony inherently unbelievable.

In fact, we do not find it all hard to believe that defendant would make the inculpatory statements attributed to him by Stabler and Jordan. After all, prior to murdering Shannon McNamara, defendant had admitted on four occasions that he had committed arson, and on two occasions that he had murdered Amy Warner. While awaiting trial for the sexual homicide of Shannon McNamara, defendant suggested, in a verbal exchange with a female correctional officer, that he would have sex with her dead body, so long as her body was "still warm." In light of those statements, it is entirely plausible that defendant would make the statements attributed to him by Stabler and Jordan. Furthermore, Stabler's testimony, which was adduced at the guilt/innocence phase of trial, related only to the details of the *McNamara* murder. Defendant raises no issue as to his guilt of that crime. The contention that Stabler's testimony supplied the jurors with an inflammatory and prejudicial account of the murder is, for all practical purposes, at most an argu-

ment that Stabler provided cumulative testimony, because one need only examine the graphic crime scene photos that were admitted into evidence, and consider the testimony of crime scene investigators who testified, to fully appreciate the brutality defendant visited upon McNamara and the horrible end she met. In sum, there was no showing that Stabler's testimony was so unreliable as to be inadmissible, and defendant was not prejudiced in any event.

The same is true of Jordan's second-stage sentencing testimony. Although that testimony was not cumulative of other testimony, the testimony bore upon the issue of defendant's future dangerousness, and there was certainly a plethora of evidence on that score, more than enough to inspire confidence that the jury's verdict would not have been otherwise, even without Jordan's testimony.

## V. Excessive Sentence Argument

Defendant contends that his death sentence is excessive given "the influence of prescription drugs on defendant, defendant's inherited alcoholism, military service, employment, attending college, minor prior criminal conviction, church attendance, low risk of future dangerousness, and dysfunctional family." We find that defendant's death sentence was not excessive or in any sense "fundamentally unjust." As we have stated, the aggravating evidence against defendant was overwhelming; the mitigating evidence was, in our opinion, meager by comparison. The fact that the jury returned a death verdict in less than three hours is testament to the state of the evidence. We will address the elements of defendant's argument individually.

First, we note that defendant failed to demonstrate a connection between his violent behavior and the ingestion of either prescription drugs or the antimalarial drug Lariam. Defendant's contention that his behavior "may

have been influenced by antidepressant medications" and "anti-malaria medication given to him in the Marines" is little more than speculation. The sole testimony concerning the possible side effects of Lariam and the prescription drugs defendant was taking came not from a psychiatrist or pharmacologist, but from a psychologist, Mark Cunningham, who possessed no particular expertise in the effects of prescription drugs. Cunningham's only knowledge of the medication's possible side effects came from pharmacological flyers. Cunningham's deficiencies aside, we note that defendant did not even establish that he was given Lariam, though Cunningham suggested that Lariam is the antimalarial drug of choice in the military. Even assuming defendant was given Lariam, Cunningham admitted he knew of no case in which the ingestion of Lariam had been connected to the commission of a murder. He conceded he could not "draw a *** direct certain nexus" between Lariam and murder. Nevertheless, he maintained—without reference to supporting data or studies—that the possible use of Lariam, "several years" prior to the murder, might have been a "potential contributor." Cunningham also claimed that Paxil "could have some contributing role," without offering any meaningful substantiation. The fact that defendant may have reported occasional symptoms which matched the side effects Cunningham gleaned from pharmacological flyers does not, in our opinion, qualify as meaningful substantiation. The testimony defendant presented did not affirmatively link his violent behavior to prescription drugs or Lariam.

Next, we note that defendant's claim of "inherited" alcoholism is highly questionable in terms of credibility and, in our opinion, did little to help defendant at sentencing. Apparently, defendant believed he would be less blameworthy in the eyes of the jurors for his failure to seek help with his drinking problems, and his failure

to earnestly try to overcome them, if he attributed the problems to genetics and family models. We believe defendant was mistaken in this respect. Moreover, the case defendant made for "inheriting" alcoholism is not convincing.

For example, the incredible amounts of alcohol purportedly imbibed by defendant's uncle on a daily basis, quite frankly, taxes credibility. Defendant's uncle, Michael Mahorney, testified that he, at one point in his life, consumed "three to four fifths a night plus a six-pack or twelve-pack of beer and three or four shots of tequila. And that was seven nights a week." Even if someone were to believe this implausible testimony, other aspects of Mahorney's testimony actually undercut defendant's claim. Mahorney testified that defendant's father drank, but Mahorney had only seen him drunk once in his life. Moreover, Mahorney testified that, despite heavy drinking during a portion of his life, he had only been arrested on one occasion for illegal consumption of alcohol, and his drinking never resulted in violent behavior. Mahorney's testimony thus points up the fact that violent behavior is not a feature of alcoholism so much as a component of character. Finally, Mahorney testified that, at the time of trial, he consumed perhaps one beer every two months. Thus, Mahorney's testimony highlighted the fact that *he* had eventually faced his problem, *he* had taken responsibility for it, and *he* had overcome it.

Other evidence presented to establish an "inherited" aspect to defendant's drinking problems was weak at best. In addition to their uncle, Michael Mahorney, defendant's sister, Christina, suggested that a cousin, Jonathon, also had problems with alcohol. She provided no further details. Defendant's stepgrandmother, Darlene Edwards, testified to only occasional and moderate drinking by two members of defendant's maternal

lineage. A defense consultant, Barry Hargan, testified that defendant's alcohol dependence was genetically influenced, noting there was "a family history on both sides of the family including his father, his uncle, his grandfather, and there was also suspicion that his mother was also involved in alcohol abuse too." Hargan supplied no specific details as to the source of his information—though he identified family members as a primary source—or the extent of any alleged alcohol abuse.

The record suggests, if defendant's mother abused alcohol at all, that abuse was restricted to a fairly limited period of time. Obviously, Mahorney's testimony, and defendant's own statements to Dr. Dietz, contradict any suggestion that defendant's father was an alcoholic. In his interview with Dietz, defendant described his father as a "teetotaler," not a "drunk." Mahorney's testimony actually underscored the fact that defendant's violent behavior was a component of his character, not an inherent feature of alcoholism.

This court has recognized that a history of substance abuse is a double-edged sword at the aggravation/ mitigation phase of a penalty hearing. *Ballard*, 206 Ill. 2d at 189, quoting *People v. Madej*, 177 Ill. 2d 116, 138 (1997). Simply because the defendant views his substance abuse history as mitigating does not require the sentencer to do so. *Ballard*, 206 Ill. 2d at 190, quoting *Madej*, 177 Ill. 2d at 138. Indeed, the jury was free to conclude that defendant's dependencies were aggravating and simply had no mitigating value. Moreover, any psychological or social maladjustments defendant may have developed are not inherently mitigating either. See *Ballard*, 206 Ill. 2d at 190; *People v. Macri*, 185 Ill. 2d 1, 66 (1998); *Madej*, 177 Ill. 2d at 138. A sentencing jury might well consider such evidence as either aggravating or mitigating, depending on whether the individual jury finds that it evokes compassion or demonstrates possible future

dangerousness. *Ballard*, 206 Ill. 2d at 190; *People v. Tenner*, 175 Ill. 2d 372, 382 (1997). Even if a defendant's alleged psychological impairments are considered as mitigating factors, they do not preclude imposition of a death sentence when they are outweighed by aggravating evidence. *Ballard*, 206 Ill. 2d at 190; *Madej*, 177 Ill. 2d at 139-40.

We believe the effort to blame defendant's drinking problems upon an alleged genetic or family predisposition was little more than a thinly veiled effort to divert responsibility from defendant for his failure to address his problems and take responsibility for them. To the extent that credible evidence *was* adduced on this subject, and that evidence might be considered mitigating, we find the weight of that evidence was insignificant.

Defendant also suggests that his military service was a significant mitigating factor. While defendant's friend, Brad Adams, did describe him as a good soldier, we also note that defendant was apparently reprimanded three times for drinking and was subsequently court-marshaled for use of methamphetamine. He ended his military career as he had begun it, as a private. Significantly, according to his own testimony, he concluded that career serving 30 days in the brig.

Defendant points to his employment record and his college attendance as mitigating factors. The record indicates that defendant worked a few weeks as a farmhand and was a student worker while he attended college. Defendant's employment record is unremarkable. It appears that defendant received benefits to attend college and the most that can be said of his academic career is that he failed to distinguish himself. Defendant's professed love of history was not reflected in his grades. If the record before us is an accurate indicator, he spent a great deal of his time in various sexual exploits, drinking or using drugs, entering the apartments of others

without permission, surfing the Internet, fighting, and committing crimes of greater or lesser degrees.

We agree with defendant's observation that his prior criminal record was minor, and that is an appropriate mitigating factor to consider. See *People v. Davis*, 205 Ill. 2d 349, 365-69 (2002). However, reliable evidence of serious uncharged offenses is also a proper, nonstatutory aggravating factor that must be taken in account in determining the appropriate sentence. See *Davis*, 205 Ill. 2d at 369.

Defendant suggests that his "church attendance" should be considered as one mitigating factor militating against a sentence of death. Whether mere "attendance" should be considered mitigating is questionable. To the extent that attendance says something positive about defendant's character or values, we would be inclined to agree. However, we see little credible evidence in that regard, and even less in defendant's conduct to indicate that he shares those beliefs and values, though he had the advantage of having been exposed to them in his youth. Although, just prior to the jury's deliberations on the appropriateness of a death sentence, defendant offered extensive testimony about his religious beliefs and participation in church activities, upon cross-examination he admitted that he resented organized religion and had referred to it as a scam and a crutch for the weak. In light of that testimony, and a dearth of testimony indicating that defendant translated any positive beliefs into actions, any weight properly assigned to defendant's church attendance would be *de minimis*.

Next, we note that a significant portion of defendant's evidence and argument at the second stage of capital sentencing was devoted to convincing the jury that defendant was the product of a dysfunctional family. As we have previously acknowledged, a defendant's family history, including abuse and exposure to violence during

childhood, has long been considered a potential mitigating factor at sentencing. See *Morgan*, 187 Ill. 2d at 543-44. The statutory reforms recently enacted by the legislature include a provision which specifically states that a defendant's background of extreme emotional distress or physical abuse may be considered as mitigating evidence. 720 ILCS 5/9—1(c)(6) (West 2004). The jury in this case was well aware that it could consider defendant's family history as a mitigating factor.

In assessing the propriety of defendant's death sentence, we considered, *inter alia*, the following questions: How mitigating was the evidence defendant presented? Was that evidence, together with other mitigating evidence, sufficient to outweigh the evidence in aggravation and preclude imposition of the death penalty?

We have concluded that there were likely instances of neglect early in defendant's life, and defendant's sexual experience with his stepsister qualifies as abuse; however, in many respects, the dynamics of defendant's upbringing were not so unusual. Considering defendant's childhood and adolescence in its entirety, we could not, for example, conclude that defendant suffered extreme emotional distress or physical abuse over any significant period of time. Many families might be considered "dysfunctional" in one respect or another. "Dysfunctional" is not necessarily synonymous with "abusive."

Certainly, in describing defendant as a child and adolescent, the testimony of defendant's own witnesses was conflicting. Defendant's father, Allen Mertz, thought he had a "fantastic relationship" with defendant. Although he spent long hours working to provide for his family, it appears that he engaged in activities with his children to the extent that he could. Defendant's grandmother, whom everyone acknowledged was a positive and loving influence throughout defendant's life,

described defendant as: "Just like any boy, out playing, digging in the dirt, and riding bicycles." Defendant's uncle described him as a "typical boy." Ian Tuggle, defendant's friend through childhood and high school, visited "just about every day" in defendant's house when they were children, and reported nothing remarkable. Tuggle described defendant as an "average kid." Rosella Ray, defendant's "faith partner" for confirmation, acknowledged that defendant had the support of his church and a loving grandmother as he grew up and throughout his years in high school. Defendant testified that his first memory was living with his grandmother. Defendant stated, during that time, "Everything was perfect." Defendant's "expert," Mark Cunningham, acknowledged in his testimony that defendant, in a prior interview with Dr. Dietz, had described his father as "kind," "generous," "peaceful," and "hard working." In that interview, defendant acknowledged that he respected his father and looked up to him. In the same interview, defendant denied that anyone had ever abused him, physically or sexually. He also denied that he felt emotionally abused or neglected as a child. Cunningham conceded defendant had told Dietz he had been "extremely happy as a youngster."

While it is true that Cunningham later testified that defendant, in that interview, "seemed to be trying to protect his family and not blame them for the situation that he was in," defendant had apparently overcome any such inclination by the time he testified at the second stage of capital sentencing proceedings. Defendant then testified that his father struck him several times, that he saw his father strike his stepmother a few times, and that he did not see his father much. At the sentencing hearing, defendant testified that he had been sexually abused by his older stepsister and neglected by his stepmother. Defendant's sisters also testified that they

were treated badly by their stepmother. Brandy Mertz testified that her stepmother was mean and abused them. Defendant's older sister, Christina, testified that their stepmother punished them by spanking them with a "switch from a tree." Christina said she tried to take the blame whenever possible to protect defendant and Brandy. Indeed, Brandy confirmed that Christina acted as their mother. Although Christina described her family as the "epitome of dysfunctional," she admitted *she* had gone on to have a successful career, and apparently a normal life. Christina acknowledged that defendant was very close to their grandmother. She remembered defendant as a "goofy little boy who was always happy up until *** around junior high school."

Despite the contradictory nature of some of the evidence defendant presented on this issue, we find that defendant's "dysfunctional" upbringing is, to some extent, mitigating. However, that evidence, together with other mitigating evidence, is insufficient to outweigh the evidence in aggravation and preclude the imposition of the death penalty. In this respect, we note a final consideration, and defendant's final point in this argument.

Defendant contends that his "low risk of future dangerousness" should be considered as a mitigating factor. The suggestion that defendant poses a "low risk of future dangerousness" is refuted by overwhelming evidence to the contrary. There is no question that defendant brutally murdered and mutilated Shannon McNamara. There is substantial, convincing evidence, including defendant's own admissions, that he did the same to Amy Warner two years before. Defendant might well have killed Randi Morris, but for her pleas for mercy and quick thinking. There was evidence indicating that defendant had sexually assaulted at least four women, two of whom (Morris and Darsann Barker) survived to

relate the details of the assaults. There was also testimony that defendant had attacked two other women, Guillory and Joyner, who fortuitously escaped from him through the intervention of a dog and a male companion, respectively. Defendant's propensity for fighting was so pronounced that the witnesses who mentioned it did not even bother to elaborate on specific instances.

Defendant would have us believe that his violent and aggressive behavior is inextricably linked to his use of alcohol; yet the evidence indicates otherwise. There is no evidence indicating that defendant was intoxicated when he aggressively confronted Kristi DeWitt and her husband at their home. There is no evidence that defendant was intoxicated when he offered to "get rid of" Douglas Paul's ex-girlfriend in January of 2000. There is no evidence indicating that defendant was intoxicated when he caused disturbances and got into fights while in jail awaiting trial on these charges. There is no evidence that defendant was intoxicated when he suggested to Hillary Spitz that he was prepared to have sex with her dead body, so long as her body was "still warm." In fact, there is no evidence that defendant was intoxicated when he killed Shannon McNamara or on the night that Amy Warner was killed. In short, defendant cannot blame what appears to be a feature of his character on the ingestion of alcohol.

Even if defendant's dangerous propensities were solely related to the use of alcohol, as we have previously noted, we need not consider them mitigating. See *Ballard*, 206 Ill. 2d at 190-91. Defendant had opportunities to address his problems, and he was urged by others to do so; yet there is little in the way of evidence indicating that he took personal responsibility for his problems and earnestly endeavored to confront his abuse of alcohol. So far as the record indicates, the problem has not been addressed. Even defendant's expert, Mark Cunningham,

acknowledged that inmates of correctional facilities may have access to drugs and alcohol, though he considered that access "much reduced compared to what somebody can maintain in the community." Thus, defendant remains a danger to others in this respect.

However, whether or not defendant has access to alcohol, he remains a danger to others because violence and aggressive behavior are clearly a part of his character. He is a man who can "kill without remorse." He is a man who would "kill others to force the [authorities] to kill him." He is a man who, while awaiting trial after brutally murdering and sexually mutilating Shannon McNamara, suggested to a female correctional officer that he would have sex with *her* dead body, so long as her body was "still warm." He is a man who readily hurls racial epithets and is more than willing to fight with other inmates. He is a man who disregards the orders and authority of correctional officers, who challenges even *them* to fight him, who tells *them* they are "fucking worthless."

In *Ballard*, this court noted that a defendant arrested for a capital crime has every incentive to behave flawlessly while incarcerated since good behavior might cause the sentencing authority to spare his life. *Ballard*, 206 Ill. 2d at 189. Given that incentive, an inmate, like defendant, who nonetheless violates facility rules and engages in acts of aggression and violence, demonstrates, through his conduct, a unique inability to control his conduct and function acceptably within any setting. It is clear that defendant places a low value on the lives of others. The jury could well have concluded that defendant would remain a serious danger to others, even in a prison setting, and that executing him is the only means of eliminating the threat to the safety of other inmates or prison staff. See *Simmons*, 512 U.S. at 165 n.5, 129 L. Ed. 2d at 143 n.5, 114 S. Ct. at 2194 n.5.

Given the totality of the evidence presented, defendant's death sentence is not excessive. Defendant does not suggest that any mitigating evidence was improperly excluded. Thus, the jury had before it everything which might conceivably have convinced the jury to show defendant mercy. The decision to impose the death penalty was clearly the result of overwhelming aggravating evidence.

VI. Statutory Reforms to Death Penalty Proceedings

Defendant notes that recently enacted statutory reforms in death penalty proceedings were unavailable when his sentencing took place. Defendant points to new statutes providing for discovery and reliability hearings on informant testimony (725 ILCS 5/115—21 (West 2004)), a new statutory mitigating factor concerning a defendant's background of extreme emotional distress or physical abuse (720 ILCS 5/9—1(c)(6) (West 2004)), and a new standard for weighing aggravating and mitigating evidence in order to determine an appropriate sentence (720 ILCS 5/9—1(g) (West 2004) (statute specifically provides that the sentencing authority is to weigh "the factors in aggravation and mitigation")). Defendant offers no analysis and cites no authority in support of retroactive application. In fact, in defendant's reply brief, he states he is "relying on this Court's power to override fundamentally unjust death sentences rather than asserting that new law is constitutionally required to be applied retroactively." Thus, defendant has waived the issue of retroactive application. See *People v. Davis*, 213 Ill. 2d 459, 470 (2004) ("a party is required to raise its arguments and provide citation to legal authority in its appellate brief *** to avoid waiver"); *People v. Jackson*, 205 Ill. 2d 247, 278 (2001) ("Our rules provide that an appellant's brief must contain '[a]rgument, which shall contain contentions of the appellant and the reasons therefor, with citation of the authorities ***' and '[p]oints

not argued are waived' "), quoting 177 Ill. 2d R. 341(e)(7). Morever, implicit in this portion of defendant's argument is the suggestion that the new provisions would have made a difference in his case, an implication that we flatly reject.

Defendant contends the prosecution could not have proved by a preponderance of the evidence—as required by section 115—21(d) of the Code of Criminal Procedure of 1963—that the testimony of the prosecution's informant witnesses was reliable. We believe the testimony bore sufficient indicia of reliability to warrant admission and, as we have already determined, the testimony was harmless in any event when considered against overwhelming evidence in aggravation.

With respect to the new statutory mitigating factor set forth in section 9—1(c)(6) of the Code, we note that it is new only in the sense that it is now *statutory*. Our decisions have long recognized that a defendant's family history, including abuse and exposure to violence during childhood, can be a mitigating factor at sentencing. See *People v. Morgan*, 187 Ill. 2d 500, 543-44 (1999). The jury in this case fully understood that defendant's childhood experiences could be mitigating; indeed, the defense devoted much of its case at sentencing to the presentation of such evidence. Moreover, the jury was instructed that it could consider "[a]ny other reason supported by the evidence why the defendant should not be sentenced to death." Defendant's attempt to cast his childhood as one of extreme abuse and neglect was simply not convincing, and certainly did not outweigh, as a mitigating consideration, defendant's violent conduct later in life, and his future dangerousness.

As for defendant's reliance upon the new language employed in amended section 9—1(g) of the Code (720 ILCS 5/9—1(g) (West 2004)), we note that we have previously upheld the instruction which utilized the former

statutory language (see *People v. Armstrong*, 183 Ill. 2d 130, 161 (1998)), and the new standard is really nothing more than a refined codification of the balancing process sentencing authorities already used in determining whether the death penalty should be imposed. See *Ballard*, 206 Ill. 2d at 188; *Taylor*, 166 Ill. 2d at 432; *Johnson*, 146 Ill. 2d at 145. Defendant's rights were not violated by use of an instruction employing the former statutory language, and his prospects of a different sentencing outcome would not be enhanced by use of the new language.

### VII. *Apprendi* Issue

Defendant also argues that the Illinois death penalty statute violates due process under the principles espoused by the United States Supreme Court in *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000), in that the State is not required to prove beyond a reasonable doubt that there are no mitigating factors sufficient to preclude the death sentence. We rejected this argument in *Ballard*, 206 Ill. 2d at 202-05, and we see no need to revisit the issue. As this court noted in *Ballard*:

> "[I]n terms of *Apprendi* analysis, it is not beyond question that the finding at issue in the instant case—'that there are no mitigating factors sufficient to preclude the imposition of the death sentence' (720 ILCS 5/9—1(g), (h) (West 1998))—is properly characterized as 'factual.' The second stage of Illinois capital sentencing proceedings clearly bears a marked resemblance to the balancing of factors in which trial courts traditionally engage in determining what sentence to impose within a statutory range, a practice of which *Apprendi* explicitly approved. *Apprendi*, 530 U.S. at 481, 147 L. Ed. 2d at 449-50, 120 S. Ct. at 2358." *Ballard*, 206 Ill. 2d at 204.

If the weighing of factors in the second stage of capital sentencing were to be considered a factual finding, one would logically have to conclude that standard sentenc-

ing procedures undertaken daily by hundreds of courts across this state also partake of fact-finding which would fall within the purview of *Apprendi*. We reject that notion. See also *Davis*, 205 Ill. 2d at 375 (*Apprendi* does not apply to the consideration of mitigating and nonstatutory aggravating factors at the second stage of capital sentencing, because consideration of those factors "cannot increase the penalty for the crime" beyond the statutory maximum of death established at the conclusion of the eligibility phase).

VIII. Comparative Proportionality and Related Issues

Citing Recommendations 70 and 84 of the Report of the Governor's Commission on Capital Punishment (Report of the Governor's Commission on Capital Punishment, Recommendations 70, 84 (April 2002)), defendant further contends that this court should implement proportionality comparisons on direct appeal in capital cases and suggests that a statewide data base should be compiled for this purpose. Defendant notes that some states have instituted intercase proportionality review in capital cases. We note that others, like California, have declined to do so, holding that such review is not constitutionally required. See *People v. Blair*, 36 Cal. 4th 686, 115 P.3d 1145, 31 Cal. Rptr. 3d 485 (2005); *People v. Lewis*, 26 Cal. 4th 334, 394-95, 28 P.3d 34, 76, 110 Cal. Rptr. 2d 272, 322 (2001).

We have repeatedly rejected arguments for proportionality comparisons in unrelated cases, capital or otherwise. As we stated in *People v. Johnson*, 206 Ill. 2d 348, 379 (2002), with respect to capital cases:

"Our constitutional duty is to determine whether the death penalty has been imposed arbitrarily or capriciously, or is unduly severe, considering the circumstances of the offense and the character and rehabilitative potential of the individual defendant. *People v. Williams*, 192 Ill. 2d 548, 576 (2000). Comparative proportionality review in

capital cases is not required by either the United States Constitution or the Illinois death penalty statute. Thus, we do not compare the sentence received by one individual to sentences received by other individuals convicted of similar crimes. Only when one defendant is sentenced to death while his codefendant or accomplice, convicted of the same crime, receives a lesser sentence will we engage in a comparative review of disparate sentences."

This court has consistently held that each capital case " 'is unique and must be evaluated on its own facts.' " *Ballard*, 206 Ill. 2d at 179, quoting *People v. Johnson*, 128 Ill. 2d 253, 280 (1989). We see no reason to overturn existing precedent on this point. Further, we note that provisions calling for comparative proportionality review were not among the reforms the legislature chose to enact.

In any event, we note that the facts of the cases cited by defendant for purposes of comparison do not mirror the facts adduced in this case. The facts in those cases are "similar" only in the broadest sense of the word. Given the sheer volume of evidence—aggravating and mitigating—presented in the second stage of most capital cases, we would not expect to see identity of facts such as would allow for meaningful comparison. That is true in this case.

Defendant's final argument is that "Illinois' death penalty is arbitrarily applied, based on race, geography, procedural evolution, discretion, and mistakes of fact." Defendant contends: "Illinois death sentences result significantly from unguided discretion of prosecutors, racial bias, geographic influences, and inconsistent subjective, or mistaken, conclusions by jurors and judges."

We must reject defendant's argument, as it pertains to race, geography, procedural evolution, and discretion, based on the analysis of the United States Supreme Court in *McCleskey v. Kemp*, 481 U.S. 279, 95 L. Ed. 2d 262,

107 S. Ct. 1756 (1987), and our own decision in *People v. Stewart*, 121 Ill. 2d 93 (1988).

In *McCleskey*, the defendant, relying upon a complex statistical study, alleged that the Georgia death penalty statute was administered in a constitutionally impermissible fashion because of the likelihood that racial considerations played a part in determining whether a particular defendant received the death penalty. According to the study, after controlling for nonracial variables, defendants accused of murdering white victims were 4.3 times more likely to receive the death penalty than those accused of murdering African-Americans. The Court, assuming the validity of the study, concluded that it did "not demonstrate a constitutionally significant risk of racial bias affecting the Georgia capital sentencing process." *McCleskey*, 481 U.S. at 313, 95 L. Ed. 2d at 292, 107 S. Ct. at 1778. The Court further held that the defendant in that case had to prove that "the decisionmakers in *his* case acted with discriminatory purpose," and that "racial considerations played a part in his sentence." (Emphasis in original.) *McCleskey*, 481 U.S. at 292-93, 95 L. Ed. 2d at 278, 107 S. Ct. at 1767.

In *Stewart*, this court applied the *McCleskey* rationale in a postconviction context. The defendant in *Stewart*, like the defendant in *McCleskey*, argued that Illinois' death penalty statute "is being applied in a racially discriminatory manner in violation of the United States and Illinois Constitutions." In support of that claim, defendant proffered a statistical study which purportedly showed that a defendant accused of murdering a white victim was four times more likely to receive the death penalty than a defendant accused of murdering a black victim. The study also purportedly showed that a black defendant accused of murdering a white victim was more likely to receive the death penalty than a white defendant accused of murdering a white victim. See *Stewart*, 121

Ill. 2d at 106-07. Applying the rationale of *McCleskey*, this court rejected defendant's contention that he was entitled to any relief on the basis of that study, noting that, as in *McCleskey*, "defendant made no attempt to prove that he received the death penalty because the decisionmakers in his case were motivated by racial bias. Moreover, in each of defendant's cases, constitutionally permissible factors clearly existed upon which the death penalty could be imposed." (Emphasis omitted.) *Stewart*, 121 Ill. 2d at 108.

The *Stewart* court also rejected another argument based upon a survey offered by defendant. Based on that survey, the defendant claimed that "the death penalty statute is unconstitutional because it leads to arbitrary and capricious application of the death penalty insofar as it *** delegates to prosecutors, without sufficient guidelines, the discretion to determine in which cases the death penalty will be sought." *Stewart*, 121 Ill. 2d at 109. This court first noted, as to the survey cited by defendant, there was "virtually no suggestion as to the reasons why the death penalty was or was not sought in any given case." (Emphasis omitted.) *Stewart*, 121 Ill. 2d at 111. Moreover, this court observed:

> "[D]efendant does not claim that the prosecutors in *his cases* acted arbitrarily in seeking the death sentence. See *McCleskey v. Kemp* (1987), 481 U.S. 279, 296 n.17, 95 L. Ed. 2d 262, 281 n.17, 107 S. Ct. 1756, 1768 n.17 ('Requiring a prosecutor to rebut a study that analyzes the past conduct of scores of prosecutors is quite different from requiring a prosecutor to rebut a contemporaneous challenge to his own acts')." (Emphasis added.) *Stewart*, 121 Ill. 2d at 112.

Finally, in *Stewart*, this court pointed out that " 'a prosecutor cannot arbitrarily impose the death penalty' since imposition of that penalty is the province and responsibility of the sentencing body." *Stewart*, 121 Ill. 2d at 112, quoting *People v. Lewis*, 105 Ill. 2d 226, 252 (1984).

Defendant does not argue that race, prosecutorial discretion, procedural evolution, or geography played a part in the decision to seek the death penalty in *his* case, or in the jury's decision to impose it on *him*. The rationale of *McCleskey* and *Stewart* thus applies. We note, in passing, defendant's observation that the Governor's Commission recommended revision of the death penalty statute to provide for mandatory review of prosecutorial decisions to seek the death penalty, a review to be undertaken by a statewide review committee. Report of the Governor's Commission on Capital Punishment, Recommendation 30 (April 2002). That is one of many recommendations the legislature chose to omit from recent statutory reforms. For our part, we believe the reasoning of *McCleskey* and *Stewart* demonstrates that *judicial* review of such decisions is not constitutionally required.

Finally, defendant argues that death penalty proceedings are "unavoidably arbitrary" because they involve "discretionary decision making." He adds that factual error at the second stage of sentencing proceedings "contributes to arbitrary death penalty sentencing."

In the latter respect, defendant points to no additional allegations of error. We believe we have adequately addressed those previously raised. We are confident those alleged errors did not contribute to arbitrary death penalty sentencing in defendant's case. As for the former contention, this court has repeatedly rejected claims that the Illinois death penalty statute fails to sufficiently minimize the risk of arbitrarily and capriciously imposed death sentences. See *People v. Kirchner*, 194 Ill. 2d 502, 559 (2000). This court has held that "the requirements of proof beyond a reasonable doubt of any aggravating factor and automatic appellate review direct and limit the discretion of the sentencing body so as to minimize the risk of completely arbitrary and capri-

cious action." *Ballard*, 206 Ill. 2d at 199. Moreover, the second phase of capital sentencing necessarily involves a process of weighing relevant aggravating and mitigating factors. *Ballard*, 206 Ill. 2d at 197. The process is inherently discretionary. Defendant chose to have 12 of his fellow citizens engage in this process. In less than three hours, they unanimously concluded that death was the appropriate sentence. We have thoroughly reviewed the voluminous record in this matter, and we agree with the jury's assessment. We are confident that the discretion exercised in defendant's case was not exercised in an arbitrary or capricious manner.

For the foregoing reasons, we affirm defendant's convictions and death sentence. We direct the clerk of this court to enter an order setting Monday, January 9, 2006, as the date on which the sentence of death, entered by the circuit court of Coles County, shall be carried out. Defendant shall be executed in the manner provided by law. 725 ILCS 5/119—5 (West 2004). The clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, the warden of Tamms Correctional Center, and the warden of the institution where defendant is confined.

*Affirmed.*

JUSTICE KILBRIDE, dissenting:

As I expressed in my dissent in *People v. Hickey*, 204 Ill. 2d 585, 637 (2001) (Kilbride, J., dissenting), the State of Illinois has reached a watershed in its approach to criminal procedure in capital cases. First, this court instituted new rules providing much needed procedural safeguards in capital cases to improve the reliability and accuracy of these trials. See 188 Ill. 2d Rs. 43, 411, 412(c), 416, 417, 701(b), 714. Next, the legislature adopted comprehensive statutory protections designed to improve the capital punishment system and reduce errors. These legislative reforms came too late, however, for the

defendant in this case, who argues he should have the benefit of four of these new safeguards.

The statutory measures cited by defendant state that: (1) the jury must receive instructions that the mitigating factors to be considered include evidence that "the defendant's background includes a history of extreme emotional or physical abuse" (720 ILCS 5/9—1(c)(6) (West 2004)); (2) the jury must determine unanimously, "after weighing the factors in aggravation and mitigation, that death is the appropriate sentence" before the death penalty may be imposed (720 ILCS 5/9—1(g) (West 2004)); (3) the trial court must "conduct a hearing to determine whether the testimony of [a jailhouse] informant is reliable, unless the defendant waives such a hearing" and the prosecution must timely disclose material relevant to the reliability and credibility of the informant's testimony (725 ILCS 5/115—21 (West 2004)); and (4) this court may overturn a death sentence and impose a prison term if it "finds that the death sentence is fundamentally unjust as applied to the particular case" (720 ILCS 5/9—1(i) (West 2004)).

In this case, none of these measures were available to defendant. First, the jury was not specifically instructed to consider evidence of defendant's allegedly abusive background as a mitigating factor. The jury's consideration of this factor was simply relegated to the broad, undefined category of unspecified potential mitigation material. Second, the jury was instructed to apply a different balancing test, whereby the default sentence was death unless the jury determined that the mitigation evidence was sufficiently strong to *preclude* imposition of the death penalty. Third, defendant did not waive a separate hearing on the reliability of the jailhouse informants' testimony, and no such hearing was held. Finally, defendant argues that this court is entitled to use its newly acquired statutory authority to overturn

his death sentence and impose a prison term based on the fundamental injustice of that sentence due to the prior unavailability of the other legislative reforms.

Defendant asserts that here, unlike *Hickey*, retroactive application of the additional legislative protections would affect fewer than a handful of cases. He maintains that this court should overturn his death sentence as fundamentally unjust because it was imposed in the absence of the new statutory protections. To address this argument, we must consider whether the measures are to be applied retroactively or only prospectively.

Under the most recent analytical approach adopted by this court on the issue of retroactivity, we must look first to the express temporal reach of the amendment. *Caveney v. Bower*, 207 Ill. 2d 82, 92 (2003). See also *People v. Atkins*, 217 Ill. 2d 66, 71 (2005) (restating the *Caveney* test). Here, only one of the four provisions cited by defendant includes an express statement of its intended temporal reach. Section 115—21, requiring a separate hearing on the reliability of jailhouse informant testimony, states: "[t]his Section applies to all death penalty prosecutions initiated on or after the effective date of this amendatory Act of the 93rd General Assembly." 725 ILCS 5/115—21(f) (2004). The effective date of the amendment was November 19, 2003. Thus, under the *Caveney* test, standing alone, section 115—21 is not retroactively applicable to this case. None of the other three cited provisions, however, contain a similar expression of legislative intent. Thus, to determine whether they should be applied retroactively, we must consider whether the amendments are procedural or substantive in nature. If they are procedural, they may be retroactively applied, but if they are substantive, they may not. *Caveney*, 207 Ill. 2d at 92.

While the boundary separating "procedure" and "substance" is not always clear, "procedure" generally

prescribes the means for enforcing rights or receiving remedies through a lawsuit. *Atkins*, 217 Ill. 2d at 71-72, quoting *Rivard v. Chicago Fire Fighters Union, Local No. 2*, 122 Ill. 2d 303, 310-11 (1988). Procedure encompasses " ' "pleading, evidence and practice. Practice means those legal rules which direct the course of proceedings to bring parties into court and the course of the court after they are brought in." [Citation.]' " *Atkins*, 217 Ill. 2d at 72, quoting *Rivard*, 122 Ill. 2d at 310-11. In contrast, "substantive law" involves the rights underlying the lawsuit. *Atkins*, 217 Ill. 2d at 72, quoting *Rivard*, 122 Ill. 2d at 310-11.

Here, the three remaining legislative protections cited by defendant are purely procedural in nature, concerning: (1) the contents of the jury instructions on mitigation (720 ILCS 5/9—1(c)(6) (West 2004)); (2) the jury's standard for reviewing the factors offered in aggravation and mitigation (720 ILCS 5/9—1(g) (West 2004)); and (3) this court's authority to vacate a particular death sentence and impose a term of years if the death sentence is "fundamentally unjust" (720 ILCS 5/9—1(i) (West 2004)). These matters focus on "the course of the court" after the start of the proceedings, not on the rights underlying those proceedings. Therefore, under this court's analysis in *Caveney*, these legislative safeguards are subject to retroactive application.

I also find it telling that in enacting its death penalty reforms, the legislature did, in fact, choose to limit the new requirement of jailhouse informant reliability hearings to future cases. Even though the other provisions at issue in this appeal were enacted as part of the same package of reforms in the same public act, they did not bear the same temporal limitation. Given the immense gravity of capital proceedings, I believe fundamental fairness and the reliability of the capital punishment system require us to apply these other legislative protections

retroactively. See *Hickey*, 204 Ill. 2d at 639 (Kilbride, J., dissenting) (asserting that "[i]f we are to err, we should err on the side of caution").

"The hard fact is that sometimes we must make decisions we do not like. We make them because they are right, right in the sense that the law and the Constitution, as we see them, compel the result. And so great is our commitment to the process that, except in the rare case, we do not pause to express distaste for the result, perhaps for fear of undermining a valued principle that dictates the decision." *Texas v. Johnson*, 491 U.S. 397, 420-21, 105 L. Ed. 2d 342, 364, 109 S. Ct. 2533, 2548 (1989) (Kennedy, J., concurring). Here, despite the despicable nature of the crime committed, this court must apply our retroactivity precedent evenhandedly. The same body of law protects both the innocent and the guilty from manifest injustice. To optimize the overall reliability of the capital punishment system in this state, this court should implement the latest legislative reforms retroactively in all applicable cases, including the one currently before us. Accordingly, I would remand this cause for a new sentencing hearing incorporating these protections. For these reasons, I respectfully dissent from the majority opinion.